(No. 56995.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RANDY C. DAUGHERTY, Appellant.

*Opinion filed June 29, 1984.—Rehearing denied September 28, 1984.*

Charles M. Schiedel and Gary S. Rapaport, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Michael B. Weinstein, Kenneth A. Fedinets, David Bindi, Ellen M. Flaum and Mark L. Rotert, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE SIMON delivered the opinion of the court:

At a jury trial in the circuit court of Pike County the defendant, Randy Daugherty, and his codefendant, Clarence Hargis, were found guilty of the armed robbery and murder of Richard Dark. The defendant was sentenced to death for the murder and appeals directly to this court (87 Ill. 2d R. 603). Hargis was sentenced to a term of natural life and appealed to the appellate court. *People v. Hargis* (1983), 118 Ill. App. 3d 1064.

The prosecution's case consisted of circumstantial evidence linking the defendant and Hargis to the robbery and murder of Dark. Members of Dark's family testified that after September 5, 1981, they had not seen him alive. Three witnesses testified that on that date they saw Dark in the company of the defendant and Hargis at various locations. The three were last seen together at the Spot Tavern in Barry, Illinois, where the defendant and Hargis began playing pool about 8:30 in the evening while Dark sat at a table. After completing their game, the defendant and Hargis sat down and talked quietly at a table separate from Dark, and the bartender testified that whenever she approached the two would become silent. The bartender stated that Dark left the tavern with the defendant and Hargis at about 10:30 p.m. She also testified that the defendant was wearing a grey sweater which was admitted into evidence.

On the following day, the defendant and Hargis were seen together in Dark's car, but Dark was not with them. Billy Clark testified that on that day he first saw the defendant and Hargis at noon in Pittsfield. About an

hour later he and a friend were out driving and they saw Hargis. They gave him a ride and then picked up the defendant and drove to a parking lot in New Salem where Dark's car was parked.

Clark testified that Dark's car would not start, and so the defendant and Hargis gathered a grey sweater and two pairs of blue jeans from the back seat, placed them in a paper bag, and transferred them to the trunk of Clark's car. Clark identified the grey sweater admitted in evidence as the sweater that was transferred to his car, and testified that when the defendant and Hargis took it out of Dark's car, it appeared to have bloodstains on it. Another witness later saw the defendant soaking this sweater. Clark also testified that each pair of blue jeans also had blood on them.

Dark's family thought he was leaving to visit relatives, so they did not contact the authorities immediately upon his disappearance. However, after a week they became suspicious, especially after a family friend reported that Dark's car had been abandoned in the New Salem parking lot. When the family notified authorities of Dark's disappearance, the police had his car towed in for investigation. They found bloodstains on the carpet and on a seat-belt bracket inside the car. They also found two of the defendant's personal checks, one of which was made out to Hargis.

After finding the checks and interviewing the witnesses who related the movements of the defendant and Hargis on September 5 and 6, the police began looking for them in connection with Dark's disappearance. Hargis talked with the officers several times, and then came into the State Police headquarters at Pittsfield and had another conversation. On this occasion, Hargis drew a map and accompanied police officers to a remote field on a gravel road where Dark's body and wallet were found at the bottom of a well. The wallet contained his

identification, but none of the proceeds of the social security check he had reportedly received two days before his disappearance. After viewing the body, the officers and Hargis continued down the road until they stopped at a bridge where an officer found a closed folding knife on the creek bed beneath the bridge. At trial Clark testified that he had seen the defendant with this knife during the summer of 1981.

A doctor who performed an autopsy determined that Dark had received five knife wounds, four in the chest and one in the abdomen. The doctor concluded that only one of these had caused his death—a chest wound that had penetrated the aorta.

Neither the defendant nor Hargis presented any evidence on his own behalf during the guilt phase. After the prosecution elected to seek the death penalty for both defendants, they waived a jury for the sentencing hearing. At the first phase of the hearing the prosecution's position was that it would prove the defendant eligible for the death penalty because the murder of Dark occurred in the course of the felony of armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6) (subsection 6)) and because the defendant had previously been convicted of another murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(3) (subsection 3)). The prosecution sought the death penalty for Hargis only on the first ground. A certified copy of the defendant's conviction for an unrelated murder was admitted into evidence. (See 112 Ill. App. 3d 541.) Statements made by the defendant to law-enforcement officers as well as statements made by Hargis were also admitted. The court declared that it would consider each statement as an admission only against the person making it in order to avoid any constitutional objection under the confrontation clause. U.S. Const., amend. VI.

In the defendant's first statement, he admitted driv-

ing around with Dark and Hargis on September 5. The defendant claimed that during their travels Hargis had asked for the defendant's knife because he intended "to stab or kill *** Dark and get his money." The defendant gave Hargis the knife, not believing that he would really go through with his plan. Later, when Dark stopped the car so that they could relieve themselves the defendant stood apart from Dark and Hargis. Turning around, he heard Hargis yell, "Randy, finish it." The defendant, at first, did not understand what Hargis meant, but then he saw Dark bend over clutching his stomach and fall. The defendant thought that Hargis momentarily lost the knife, but found it again and stabbed Dark several more times. After it was over, Hargis said to the defendant, "Didn't think I'd do it, did you?" and the defendant replied, "No." The defendant also maintained that there had not been any prearranged plan to rob Dark, and that he had not stabbed the victim during the incident. After the murder, Hargis took $13 from Dark's wallet and gave $6 to the defendant. They then disposed of the body and the knife, and changed clothes.

The defendant made a later statement to a polygraph examiner who was employed by the State. This statement essentially confirmed the defendant's prior statement except that he admitted "poking" the victim at least once after Hargis dropped the knife. The defendant insisted, however, that he had not "killed" Dark.

In his first statement Hargis also admitted that he and the defendant were with Dark on September 5. Hargis, however, stated that at the Spot Tavern he and the defendant had a serious argument over the pool game. Later, when Dark stopped the car, Hargis and the defendant began quarreling again. When Dark attempted to break up the altercation, the defendant stabbed him. Hargis stated that the defendant put the body into the car and disposed of it in the well, and dis-

carded the knife in the creek.

In a second statement made to the polygraph examiner, Hargis said that after Dark pulled off the road the scuffle the defendant got into was with Dark, and not himself. As he intervened to stop the quarrel, Hargis accidentally stabbed Dark in the side. The two then disposed of the body together.

The court found the defendant eligible for the death penalty under subsection 3 because he had been convicted of two or more murders. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(3).) The court also found both the defendant and Hargis eligible for the death penalty under subsection 6 which authorizes that penalty when "the murdered individual was killed in the course of another felony if *** the murdered individual was *actually killed* by the defendant and not by another party to the crime or simply as a consequence of the crime ***." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6)(a).) Although the trial judge admitted that he could not determine which defendant struck the fatal blow to the chest, he nevertheless concluded that both defendants had "actually killed" the defendant and were eligible for the death penalty under subsection 6. He said:

"The defendants *** seem to point the accusing finger at the other person stating well, he really did it and that is the effect; ***. The statements by both individuals indicate some actual participation in the course of the events which led up to the death of the victim, and I am talking about the wielding of the knife. I believe Mr. Hargis related the testimony that he stabbed and it was an accident, and he didn't intend to. I believe Mr. Daugherty indicated about the so-called 'poking.' So, what we have here is a person who has been shown to be killed by the way of a knife and each of the defendants admits some participation in the wielding although they characterize it as an accident or some 'poking;' but in any event, it was the 'poking,' the insertion of a knife into the deceased.

And I presume in a situation such as this we're talking about—well, who actually did the killing, the fatal blow. \*\*\* *We cannot get into a situation where when both participate that the intent of the Statute is denied because of multiple participation. The Court will find that the qualifying factor in Number 6 has been proven as to both defendants.*" (Emphasis added.)

At the second phase of the death penalty hearing the prosecution introduced testimony concerning the defendant's prior conviction for the unrelated murder of a parole officer who was found in a cornfield outside Pittsfield on September 15, 1981, with 17 stab wounds in his chest. Two witnesses also testified about an unrelated conspiracy between Hargis and the defendant to rob and murder another man during the second week of September 1981. The defendants each produced certain evidence in mitigation.

The circuit court judge found that Hargis' prior criminal record did not include any crimes of violence and that he was "characterized as a coward, timid perhaps is what it meant \*\*\* a person not likely to engage in violent activities." He relied on these factors in mitigation in sentencing Hargis. Concerning the defendant, the judge found a history of escalation of antisocial conduct from an early age. The circuit judge also noted the close sequence of the two murders and the unrelated conspiracy to commit murder, and concluded that there were no factors in mitigation and that the defendant should be sentenced to death.

Before trial the defendant and Hargis each presented motions to sever their cases for trial. The defendant contends that the denial of his motion was both an abuse of discretion and led to a denial of due process at his trial. We agree that the cases should have been separated for trial.

A defendant does not have a right to be tried sepa-

rately from his codefendants in every case where they are charged together with offenses arising out of a common occurrence. (*People v. Ruiz* (1982), 94 Ill. 2d 245, 257.) "The general rule is that defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice." *People v. Lee* (1981), 87 Ill. 2d 182, 187.

A defendant who believes that he will suffer prejudice as a result of the joinder of his case with that of a codefendant may request severance by pretrial motion. (Ill. Rev. Stat. 1981, ch. 38, par. 114—8.) "The motion must demonstrate how the defendant is going to be prejudiced by proceeding with a joint trial. Mere apprehensions of prejudice are not enough." (*People v. Lee* (1981), 87 Ill. 2d 182, 186.) In ruling on the motion for severance the trial judge must make a prediction about the likelihood of prejudice at trial, taking into account the papers presented, the arguments of counsel, and any other knowledge of the case developed from the proceedings. (See *People v. McMullen* (1980), 88 Ill. App. 3d 611, 614.) The trial court's decision will not be reversed absent an abuse of discretion. *People v. Canaday* (1971), 49 Ill. 2d 416, 424.

Trial courts generally grant motions for severance based on two common forms of prejudice. The first type occurs when a codefendant has made hearsay admissions that implicate the defendant. The defendant may be denied his constitutional right of confrontation if the codefendant's hearsay admission is admitted against him and the defendant is unable to cross-examine the codefendant because the latter does not testify. "Because the defendant cannot call the codefendant to the stand for cross-examination, either a separate trial should be ordered or the admission should be redacted to eliminate any references to the defendant." *People v. Lee* (1981), 87 Ill. 2d 182, 187; see also *Bruton v. United States*

(1968), 391 U.S. 123, 134 n.10, 20 L. Ed. 2d 476, 484 n.10, 88 S. Ct. 1620, 1626-27 n.10; *People v. Clark* (1959), 17 Ill. 2d 486, 490.

A second type of prejudice occurs when defenses of the various defendants are so antagonistic that a severance is imperative to assure a fair trial. (*People v. Lee* (1981), 87 Ill. 2d 182, 188.) The classic example of antagonistic defenses arose in *People v. Braune* (1936), 363 Ill. 551, where each defendant "was protesting his innocence and condemning the other." (363 Ill. 551, 555.) In *Braune* it was apparent "that an actual and substantial hostility existed between the defendants over their lines of defense. *** Criminations and recriminations were the inevitable result." (363 Ill. 551, 555.) In *Braune* each defendant attempted to discredit the witnesses of his codefendant. "The trial was in many respects more of a contest between the defendants than between the People and the defendants. It produced a spectacle where the People frequently stood by and witnessed a combat in which the defendants attempted to destroy each other." (363 Ill. 551, 557.) This court held in *Braune* that to guarantee a fair trial to both defendants the motion for severance should have been granted.

In this case the defendant and Hargis alleged both forms of prejudice. They each had made the statements to law-enforcement officers that were later admitted in evidence at their sentencing hearing. In his statement, Hargis accused the defendant of stabbing Dark while Dark tried to break up an altercation between the defendant and Hargis. Hargis claimed that the defendant alone had disposed of the body and the murder weapon. The defendant, on the other hand, accused Hargis of planning to rob Dark and stabbing him in the chest several times. Although the defendant admitted helping Hargis dispose of the body, he vigorously maintained that he had not planned with Hargis to rob and

kill Dark, nor had he stabbed the victim during the murder.

The circuit court judge in this case was first made aware of the conflicting claims of the defendants when their statements were related to him by law-enforcement officers at the preliminary hearing. Later in his motion for severance, Hargis contended:

> "That their defenses, through investigation, have been found to be so antagonistic as to result in an unfair and prejudicial trial if they were tried together.
>
> That the confession of Randy Daugherty, co-defendant, is so highly incriminating as to defendant that it would be impossible for Defendant Eddie Hargis to obtain a fair trial if tried with co-defendant."

A copy of the defendant's first statement was attached to Hargis' motion. The court at this time was not aware of the statement to the polygraph examiner.

At the hearing on Hargis' motion, the trial judge informed counsel that he recalled the testimony at the preliminary hearing concerning the statements Hargis and the defendant had made. The judge said: "Let me say that the Court heard the preliminary hearing, the evidence adduced, and we had a situation where one said no, I didn't do it; he did it. That's what they both said in fact." The prosecutor then stipulated that he would not use either of the codefendants' statements at trial. Although this eliminated the source of any problem under the confrontation clause, it did nothing to alleviate the codefendants' concerns about their antagonistic lines of defense. Nevertheless, the court concluded that the prosecutor's stipulation had eliminated "[a]ny reason for a severance" and denied Hargis' motion. When the defendant later filed his motion for severance on similar grounds, the trial court observed that it would treat it as having been filed before his ruling on Hargis' motion and that it would be denied for the same reasons.

The trial court's denial of the defendant's motion for severance was an abuse of discretion. When codefendants have each made statements implicating the other but professing their own innocence, it is almost inevitable that their lines of defense at trial will become inconsistent and antagonistic and severance is necessary to forestall that result and ensure a fair trial. In such cases, the hostility between the codefendants is likely to surface at trial whether or not they each take the stand themselves. An unacceptable spectacle occurs in which the trial becomes as much a contest between the defendants as it is a contest between either defendant and the prosecution.

The prosecution relies on several cases in which this court upheld the denial of motions for severance containing allegations of antagonistic defenses. The circumstances of this case, however, are distinguishable. In *People v. Lindsay* (1952), 412 Ill. 472, 480-82, several of the codefendants had made statements incriminating each other, but these alone did not establish any danger of prejudice arising from antagonistic defenses because, "in each of the statements made, the defendant was not attempting to exonerate himself but in effect implicated both himself and all others in the crime, each statement in substance agreeing with the statements made by each of the other defendants." 412 Ill. 472, 482.

In *People v. Yonder* (1969), 44 Ill. 2d 376, 385-86, the codefendants expressed "mere apprehensions" that without severance each defendant would incriminate the other without specifying how their defenses were antagonistic. (44 Ill. 2d 376, 386.) Likewise, in *People v. Lee* (1981), 87 Ill. 2d 182, 184-88, one defendant moved for severance claiming "that he believed the codefendants would testify on their own behalf and implicate [him]. The court was not informed of what the substance of such testimony would be" (87 Ill. 2d 182, 185), nor how

it would be antagonistic to the defendant's defense.

This case is more like the situation in *Braune* than like *Lindsay, Yonder* or *Lee*; the circuit court was apprised that each defendant was incriminating the other while asserting his own innocence, and the court was informed of the statements of each defendant to that effect. It should have been apparent to the trial judge that the danger of prejudice and confusion caused by these antagonistic defenses was great, and the motion for severance should have been granted.

In reviewing the trial court's decision on the motion for severance we do not, consistent with *People v. Yonder* (1969), 44 Ill. 2d 376, 386, consider "the subsequent happenings at trial," but what actually took place in this case dramatically illustrates the risk of prejudice involved in permitting the joinder of defendants in a case based wholly upon circumstantial evidence, where each defendant has accused the other of the crime while professing his own innocence. The prosecution introduced testimony, over the defendant's objection, that Hargis had cooperated fully with the law-enforcement officers, drawn a map for them, taken them to the well where the victim's body was hidden, and helped them find the murder weapon. The closing arguments of each defendant served the purpose of apprising the jury of his theory of the proper inferences to be drawn from the evidence.

In his closing argument, the defendant's attorney stressed that the jury should make an independent determination of the elements of the offenses proved against each defendant. In support of this argument the defendant's counsel argued that the evidence established that Hargis was the killer:

"I'll *** emphasize my client's connection to the whole transaction that involves this particular knife that was—remember, shown to the People not by Randy Daugherty. It wasn't Randy Daugherty who showed that

knife, where that knife was. It was Edward Hargis. Edward Hargis is a separate defendant in this case. *** Billy Clark said that that was Randy Daugherty's knife. *** They're not saying that it was continually Randy Daugherty's knife because the last time that *** Billy Clark had seen that it was sometime last summer. He couldn't remember exactly when he had seen it, but it was quite a bit of time before the offense that we were talking about supposedly when it occurred here. *** It wasn't Randy Daugherty who took the police out there where it was. That was done by Edward Hargis, and the conduct of Edward Hargis should be considered separate."

Later in the closing argument Hargis' counsel argued that the evidence supported the conclusion that the defendant was the murderer:

"What they *** have is what Eddie Hargis did and that is he knew where Dickie Dark's body was. And he knew where the knife was and he showed the cops that was where it was. After that they want you to find him guilty of murder. *** And they want you to discount any other reasonable possibility, any other reasonable way that he could have known about that, that Randy Daugherty could have done it. And Randy Daugherty could have told him later. The body wasn't discovered for three weeks and only when Eddie Hargis told him. Peculiar for a murderer lead them straight to the body, very peculiar. It's Randy Daugherty's knife. Randy Daugherty is the one that had the blood on the sweater testified to by Billy Clark. *** You've got evidence that it was in the bathtub being soaked. You can draw inferences from there but it wasn't Eddie Hargis's. They didn't find any blood at any time on Eddie Hargis."

Hargis' counsel observed that the killer probably was facing Dark when he stabbed him, and the wound in the lower abdomen was on the left as the victim faced the killer, "as if it was done by a person that was left-handed. I've been able to watch both Eddie Hargis and Randy Daugherty this whole time, and Eddie Hargis is

not left handed. Randy Daugherty is." Hargis' counsel argued that the only reason Hargis was on trial for murder was because of his association with the defendant: "Eddie cooperated fully. *** [B]ecause he knows Randy Daugherty, and he was with him that night, he gets accused of murder."

The prejudice that the motion for severance was designed to prevent actually occurred in this case. The closing arguments in this case "produced a spectacle where the People *** stood by and witnessed a combat in which the defendants attempted to destroy each other." (*People v. Braune* (1936), 363 Ill. 551, 557.) Based on the information available to the trial judge the risk of prejudice inherent in this situation was apparent, and severance should have been granted. The defendant's convictions must therefore be reversed, and the cause remanded for a new trial.

The defendant's motion for severance having been improperly denied, his convictions for murder and armed robbery are reversed and his death sentence is vacated. The cause is remanded to the circuit court of Pike County for a new trial.

*Judgment reversed;*
*sentence vacated;*
*cause remanded.*