THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CURTIS DAVIS, Defendant-Appellant.
First District (2nd Division) No. 1—91—2694

Opinion filed September 28, 1993.—Rehearing denied December 16, 1993.

Rita A. Fry, Public Defender, of Chicago (Pamela Pfrang, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb and Rebecca Davidson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

After defendant Curtis Davis, Kevin "Boss" Appelby and Eric Shambley were indicted for the first-degree murder of Harvey Austin on February 21, 1989, the trial court granted each defendant's motion for severance. Accordingly, simultaneous but severed jury trials were conducted for defendant and Appelby, after which defendant's jury returned a verdict of guilty.[1] This appeal followed.

---

[1]The Appelby jury returned a verdict of not guilty, as did the jury in the subsequent trial of Shambley.

The following facts were adduced at defendant's trial. Derrick Holliday testified that on the morning of February 21, 1989, Austin and he went to visit their friend James "Sonny" Keeler at a Chicago Housing Authority (CHA) project located at 4445 South Evans Street. At about 10 a.m., Austin and Holliday encountered Shambley near the left stairwell of the building. The three began discussing the violence which had been taking place in the project when Shambley pulled a gun from his coat pocket and told Holliday and Austin that "I'm not worried about nobody doing nothing to me."

About 12:30 p.m. that same day, Holliday met defendant and Appelby near the same spot, and they also were discussing the recent violence in the area when Appelby told Holliday that he should leave the building because something was about to happen. Soon thereafter, Holliday heard Donnell Keeler and Chris Keeler chatting as they were walking down the stairwell. Holliday observed defendant and Appelby, who were both armed, and another person whom he did not recognize, move closer to the stairwell. Holliday then heard several shots ring out, although he could not tell who fired them.

After hearing the shots, Holliday saw defendant, Appelby and Shambley standing in a row near the right stairwell of the building. He then observed Austin exit the adjacent CHA project building, located at 4414 South Cottage Grove Avenue, and head toward the building located on Evans Street. Holliday warned Austin not to go to the Evans project because there had just been a shooting there, but Austin waved him off and proceeded toward his original destination. Holliday stayed in the playground between the two buildings, and about 15 minutes later, he heard six or seven shots which sounded as if they came from different guns. About 15 seconds later, he observed Austin stumbling into the playground, and he also saw defendant, Appelby and Shambley fleeing from the scene. He then ran toward Austin, who was bleeding profusely, and heard him say that "Eric shot me, Eric shot me." Austin also kept repeating "Boss, Boss, Boss," and that "he was fixing to die." Holliday placed Austin on the ground in the breezeway between the projects, and soon thereafter Hope Keeler arrived and began tending to Austin. Holliday testified that at no time during the day was Austin carrying a weapon, and he further stated that he did not recognize the .357-caliber firearm which was found at the scene.

Donnell Keeler testified that at about 1 p.m. on the date of the homicide, he and his sister Chris left their brother Sonny Keeler's apartment, and as they were descending down the left stairwell with Chris walking in front, the two encountered defendant. After Chris

said hello to him and proceeded on her way, defendant displayed a gun and asked Donnell repeatedly "why did you do it?" Donnell explained that this inquiry had reference to a dispute he had had with defendant and Appelby over the ownership of a gun. After Donnell told defendant that he had not done anything, Shambley approached him and told defendant that he should not be talking to Donnell. When Donnell saw Shambley, who was armed, raise his hand, he immediately fled back up the stairwell, and he heard three or four shots fired at him.

When he returned to Sonny's room, Donnell informed him that he had just been shot at by defendant and Shambley. Sonny then asked Austin, who had arrived at Sonny's apartment some time after Donnell had left, to try to find a peacemaker named "Buckeye" to calm the situation. On cross-examination, Donnell admitted that he had been a member of the War Lords street gang until 1988, but that he no longer belonged to that group. He also stated that his brother Sonny was once a member of that gang as well, but that Sonny had never been its chief.

Hope Keeler testified that at approximately 1:30 p.m. on February 21, 1989, she was in her mother's apartment in the Cottage Grove housing project when she heard several gunshots emanating from outside. When she looked out her window, Hope saw Austin stagger out of the adjacent building into the playground. She then rushed downstairs and tended to Austin, who was bleeding from his mouth and neck. As she was holding him, Austin mumbled to her that "Boss and Eric shot me," gasped for air, and then told her that "they gone get us one by one."

Sonny Keeler testified that on the date of the homicide, his girl friend, Austin, Donnell and Chris were in his apartment. At about 1:30, Donnell and Chris left, but Donnell returned a few minutes later and told him that defendant and Appelby had shot at him. Sonny then told Austin to try to find a man named "Buckeye" who could perhaps settle the dispute between his brother, defendant, and Appelby over the gun. Austin left the apartment and returned about 15 minutes later, but it is unclear from the record whether he actually contacted Buckeye.

In any event, Sonny and Austin, both of whom were unarmed, then left the apartment and went down the left stairwell to the main floor. Austin reached the ground floor first and immediately proceeded into the area between the two buildings. When Sonny reached the bottom of the stairs, however, he peered around the side of the building before entering the corridor, and he observed defendant, Ap-

pelby and Shambley lined up farther to the south in front of an elevator. Defendant was holding what appeared to be a long .38-caliber weapon, Appelby was carrying what looked like a .32-caliber gun, and Shambley was armed with what Sonny thought was a revolver. As he was moving back into the stairwell for cover, Sonny observed that Austin had approached to within six or eight feet of the armed individuals, and about 45 seconds later, he heard four or five shots which appeared to be coming from different guns. Sonny then ran up the stairwell back to his apartment, and when he looked down to the playground area from his porch, he observed Holliday helping Austin, who was staggering and appeared to have been shot. After the police arrived a short time later, he went down to the scene and informed an officer as to what he had seen and where the assailants might be found.

On cross-examination, Sonny testified that while he was once a member of the War Lords, he had dissociated himself from that street gang in the late 1970's. He admitted, however, that he had stated otherwise on a CBS news special which depicted him as the leader of the War Lords and on which program he stated that gangs were good for the projects, that they generated a substantial amount of income by selling illicit drugs, and that no other gang members could enter the area without his permission. Sonny explained that he fabricated this story on the news special so that attention would be focused on the gang problem in the projects which, he hoped, would result in a cleanup effort by the city.

Officer Leo Cummings testified that he was the first officer to arrive on the scene, and upon arrival, he observed about 10 or 20 people huddled around a man lying on the ground who had been shot in the neck. After he radioed for help, an unidentified man told him where the murder weapon could be found and led Officer Cummings past a trail of blood to a .357-caliber weapon lying on the sidewalk. Officer Cummings picked up the gun and removed six live rounds from its chamber, which led him to surmise that it had not been recently fired. No fingerprint analysis was performed on that weapon.

Officer Kyle Erbacher testified that he arrived on the scene shortly after Officer Cummings and immediately began to question the individuals milling around the victim in order to determine if anyone had information about the shooting. He eventually spoke to Holliday, who informed him that defendant, Appelby and another man were involved in the shooting and that they might be found in apartment number 507; but when Officer Erbacher went to that apartment, none of the suspects was there. As he proceeded back to the

playground, Officer Erbacher encountered Sonny Keeler, who told him that defendant, Appelby and Shambley were the perpetrators and that they were probably in room 510. Officer Erbacher escorted Sonny to room 510, and when Appelby answered the door, Sonny immediately identified him, and Officer Erbacher placed him under arrest.

Officer Erbacher further testified that on February 25, 1989, a few days after the homicide, he received information from a confidential informant that Shambley was staying in an apartment located at 3973 South Vincennes Avenue. He thereafter went to that location with three other officers. No one answered when he knocked on the door bearing the 3973 address, but a man named Johnson opened the door to the room across the hall, which part of the building bore a 3975 address. Officer Erbacher asked Johnson if anyone else was staying with him, and he responded that he lived with his nephew. Johnson's nephew identified himself as Brian Hugle, and in response to the officer's further questioning, he stated that his cousin named Darnell lived with them as well. Officer Erbacher then asked Hugle to have Darnell step into the hallway, and when that person did so, the officer immediately recognized him as Shambley and placed him under arrest. A subsequent search of the apartment uncovered a .38-caliber silver revolver which had three live rounds in its chamber. Ernest Warner, a firearms expert for the Chicago police department, testified that in his opinion, the bullets recovered from Austin's body were fired from that .38-caliber revolver.

Eupil Choi, M.D., the Cook County medical examiner who performed the autopsy on Austin, testified that he died from two gunshot wounds. One entered the left side of his neck, went through his esophagus, and embedded in his right shoulder area. The other entered the right side of Austin's mouth, deflected off his molars, penetrated the area beneath his tongue, and came to rest in the left side of his jaw. Dr. Choi testified that while neither of the bullets penetrated Austin's "voice box," he did find evidence of a hemorrhage in that area; nevertheless, he opined that Austin might have been able to talk while still alive after being shot. Finally, Dr. Choi testified that Austin had .67 nanograms of morphine in his blood at the time that he was shot.

Chicago police detective Patricia Harrison testified that after defendant came to Area 1 violent crimes police station with his mother on February 22, 1989, she read him his *Miranda* warnings and asked him if he wanted to tell her what had happened the day before. Defendant stated that he had been talking to Donnell Keeler

peacefully, when, without his knowledge, Shambley and another person came around the corner and began shooting at Donnell. Defendant told Detective Harrison that he ran out of the way, and after the shooting had ceased, he confronted Shambley and chastised him for shooting in his direction. While defendant denied shooting at Donnell, he admitted that he was carrying a .22 derringer weapon at the time.

Defendant told Detective Harrison that after confronting Shambley, they both went to wait for an elevator in the corridor between the two buildings. He then saw Austin exit the building located on Cottage Grove and begin jogging toward the project on Evans. Defendant stated that at that point, Shambley began shooting at Austin, and he also saw Appelby standing next to him with a gun in his hand. Defendant further related to Detective Harrison that while he did not fire the .22 derringer, he was still holding it while Shambley was firing at Austin. After the shooting, defendant fled from the scene.

After his motion for a directed verdict was denied, defendant called O.C. Glover, who testified that he worked as a security officer at the Academy of Our Lady High School, and in that capacity, he carried a .357-caliber weapon. He stated that on September 19, 1988, he stopped at a deli on the way home from work, and upon exiting the store, two men attacked him, one of whom held up his arms while the other stole the gun, which he later identified as the .357 magnum recovered at the scene of the crime, from his holster. Glover then chased the two assailants, and while in pursuit, one of them who was about 30 or 50 feet away turned around and briefly looked back at him. Glover testified that although he could not positively identify that man as Austin, the person who committed the theft vaguely resembled him.

Finally, Gloria Davis, defendant's mother, testified that while defendant often carried a weapon after 1987, it was not a long silver .38, the type of weapon which Sonny testified was in defendant's hands just prior to the shooting of Austin. She also stated that she convinced defendant to go to the police station with her and talk to the authorities about the incident.

The jury found defendant guilty of first-degree murder, and after the trial court denied his post-trial motion, it sentenced him to a term of 40 years in the custody of the Illinois Department of Corrections. Defendant appeals both his conviction and his sentence.

## I

Defendant's first assignment of error is that the trial court im-

properly prohibited his mother from testifying that he told her that he carried a gun for his protection because he was previously struck on the head and severely injured. Defendant claims that this evidence should have been admitted under the "state of mind" exception to the hearsay rule.

We disagree. Statements which indicate the declarant's state of mind are admissible as exceptions to the hearsay rule when the declarant is unavailable to testify and there is a reasonable probability that the proffered hearsay statements are truthful. (*People v. Floyd* (1984), 103 Ill. 2d 541, 546, 470 N.E.2d 293, 295; *People v. Silvestri* (1986), 148 Ill. App. 3d 980, 984, 500 N.E.2d 456, *appeal denied* (1987), 113 Ill. 2d 583, 505 N.E.2d 362.) In order to be admissible, however, the declarant's state of mind must be relevant to a material issue in the case. (*Floyd*, 103 Ill. 2d at 546, 470 N.E.2d at 295.) It is within the trial court's discretion to determine whether evidence is relevant and admissible, and its exercise of that discretion is not to be overturned absent a clear abuse thereof. *People v. Hayes* (1990), 139 Ill. 2d 89, 130, 564 N.E.2d 803, 820.

■ In the case at bar, whether or not the declarant (defendant) was unavailable to testify because he invoked his fifth amendment right not to testify, and regardless of whether or not defendant's statement to his mother as to why he was carrying a gun was truthful or trustworthy, it was clearly irrelevant to any material issue in the case, the dominant one of which was whether defendant was responsible for Austin's death. Accordingly, we hold that the trial court did not abuse its discretion in excluding the proffered hearsay testimony of defendant's mother.

## II

Defendant next argues that the trial court abused its discretion in granting the State a continuance in Shambley's trial. The record reflects that all three defendants made post-arrest statements implicating each other to some degree. Furthermore, defendants originally adopted inconsistent defenses, Shambley claiming self-defense and defendant and Appelby asserting alibi. For these reasons, each defendant moved for a severance of his trial from those of their codefendants, all of which were granted. Consequently, the court had planned on conducting three simultaneous, but severed, jury trials.

Three days before the date of trial, however, the State moved for a continuance in Shambley's trial because it could not locate two out-of-State witnesses whom it wanted to call in order to rebut

Shambley's self-defense claim. When Shambley's attorney agreed to the continuance, the court scheduled that trial for a later date.

When, on the morning that their trials were to have begun, defendant and Appelby became aware of the court's grant of the continuance to the State in Shambley's trial, they immediately objected, arguing that it deprived them of their right to have their juries hear Shambley's testimony, which they argued would be crucial to the self-defense claims they filed that same morning. The trial court overruled the objections, and defendant now contends that the trial court abused its discretion in granting the State a continuance in Shambley's trial.

Defendant first argues that the court abused its discretion because once he and Appelby adopted self-defense as one of their defenses, the court should have "unsevered" the trials of the three defendants, even though each had previously moved for severed trials, since they were no longer alleging inconsistent defenses. We cannot agree.

The general rule in this State is that defendants jointly indicted are to be jointly tried unless fairness to one of them requires a separate trial to avoid prejudice. (*People v. Thomas* (1987), 116 Ill. 2d 290, 301, 507 N.E.2d 843, 847; *People v. Byron* (1987), 116 Ill. 2d 81, 92, 506 N.E.2d 1247, 1251; *People v. Daugherty* (1984), 102 Ill. 2d 533, 541, 468 N.E.2d 969, 972.) Under section 114—8 of the Code of Criminal Procedure of 1963 (the Code) (Ill. Rev. Stat. 1989, ch. 38, par. 114—8), however, a defendant who believes that he or she will suffer prejudice as a result of the joinder may request a severance in a pretrial motion which demonstrates how he or she would be disadvantaged by proceeding with a joint trial. (*Daugherty*, 102 Ill. 2d at 541, 468 N.E.2d at 972; *People v. Lee* (1981), 87 Ill. 2d 182, 186, 429 N.E.2d 461, 463.) In ruling on a motion for a severance, the trial judge must ascertain the likelihood of prejudice at trial, and his determination will not be reversed absent an abuse of discretion. *Daugherty*, 102 Ill. 2d at 541, 468 N.E.2d at 972-73.

In *Daugherty*, our supreme court held that motions for severance should generally be granted when two specific types of prejudice are present, explaining:

"The first type occurs when a codefendant has made hearsay admissions that implicate the defendant. The defendant may be denied his constitutional right of confrontation if the codefendant's hearsay admission is admitted against him and the defendant is unable to cross-examine the codefendant because the latter does not testify. 'Because the defendant cannot call

the codefendant to the stand for cross-examination, either a separate trial should be ordered or the admission should be redacted to eliminate any references to the defendant.' *People v. Lee* (1981), 87 Ill. 2d 182, 187[, 429 N.E.2d 461, 463]; see also *Bruton v. United States* (1968), 391 U.S. 123, 134 n.10, 20 L. Ed. 2d 476, 484 n.10, 88 S. Ct. 1620, 1626-27 n.10; *People v. Clark* (1959), 17 Ill. 2d 486, 490[, 162 N.E.2d 413, 416].

A second type of prejudice occurs when defenses of the various defendants are so antagonistic that a severance is imperative to assure a fair trial. [Citation.] The classic example of antagonistic defenses arose in *People v. Braune* (1936), 363 Ill. 551[, 2 N.E.2d 829], where each defendant 'was protesting his innocence and condemning the other.' [Citation.] *** 'The trial was in many respects more of a contest between the defendants than between the People and the defendants. It produced a spectacle where the People frequently stood by and witnessed a combat in which the defendants attempted to destroy each other.' [Citation.] This court held in *Braune* that to guarantee a fair trial to both defendants the motion for severance should have been granted." *Daugherty*, 102 Ill. 2d at 541-43, 468 N.E.2d at 973.

▮ Applying these principles to the instant case, it is clear that the trial court properly granted each defendant's motion for severance because it was faced with a situation where both types of prejudice discussed in *Daugherty* existed: Shambley's defense of self-defense was antagonistic to defendant's and Appelby's defense of alibi, and each defendant implicated the others to some extent in his post-arrest statements. That being the case, we find defendant's argument that the court should have vacated its order severing the trials once he and Appelby added self-defense as one of their defenses to be plainly without merit,[2] since the court was still presented with a situation wherein each defendant incriminated the others in his post-arrest statements. For instance, defendant pinned the shooting of Austin solely on Shambley. Had that evidence been admitted in a joint trial of these defendants, an obvious *Bruton* violation would have occurred since defendant did not take the stand (*Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620); thus, Shambley would have had no opportunity to cross-examine him with

---

[2]We note also that defendant made no formal motion withdrawing his earlier request for a severance.

regard to his inculpatory statements. Accordingly, we hold that the trial court properly refused to conduct a joint trial of defendant and his codefendants.

Defendant further argues, however, that even if the trial judge properly severed his trial from those of his codefendants, his grant of a continuance to the State in Shambley's trial still unfairly prejudiced him because it prevented his jury from hearing Shambley's testimony, which defendant alleges would have bolstered his self-defense claim. Defendant's argument is without warrant.

To begin with, we note that the trial court intended to conduct three simultaneous severed trials of the codefendants, a procedure which our courts have consistently approved in similar fact situations. (See *People v. Ruiz* (1982), 94 Ill. 2d 245, 259, 447 N.E.2d 148, 152-53; *People v. Negron* (1991), 220 Ill. App. 3d 754, 766-67, 580 N.E.2d 1301, 1310-11, *appeal denied* (1992), 143 Ill. 2d 645, 587 N.E.2d 1022; *People v. Johnson* (1986), 150 Ill. App. 3d 1075, 1089-90, 502 N.E.2d 304, 314-15, *appeal denied* (1987), 114 Ill. 2d 552, 505 N.E.2d 358; *People v. Knight* (1985), 139 Ill. App. 3d 188, 195, 486 N.E.2d 1356, 1361; *People v. Gholston* (1984), 124 Ill. App. 3d 873, 888, 464 N.E.2d 1179, 1190-91; *People v. Church* (1981), 102 Ill. App. 3d 155, 164, 429 N.E.2d 577, 584.) However, we have invariably emphasized that such a procedure is permissible only "where a defendant is given every opportunity to present a complete defense before one jury, cannot point to any event which confused the jury or affected its ability to render a decision fairly, and the record shows that the trial judge adequately prepared the jurors for the procedure." (*Church*, 102 Ill. App. 3d at 164-65, 429 N.E.2d at 584; accord *Negron*, 220 Ill. App. 3d at 766-67, 580 N.E.2d at 1310-11; *Johnson*, 150 Ill. App. 3d at 1089-90, 502 N.E.2d at 314-15; *Gholston*, 124 Ill. App. 3d at 888, 464 N.E.2d at 1190.) Moreover, absent a showing of prejudice, we will not speculate as to any impropriety in the procedure. *Negron*, 220 Ill. App. 3d at 766-67, 580 N.E.2d at 1311.

■ Defendant urges that had the State's request for a continuance in Shambley's case been denied, defendant's jury would have heard Shambley's testimony in his own trial. What defendant continually fails to apprehend, however, is that even if Shambley would have been tried simultaneously with him and Appelby, defendant's jury would not have been permitted to hear Shambley's testimony at his own trial, since the two causes were severed. For example, the record reflects that in the simultaneous trials of defendant and Appelby, the trial judge properly removed the appropriate jury from the courtroom each time evidence was being introduced with respect to

the trial in which they were not sitting. Such would have clearly been the case had Shambley been tried with his two codefendants and had he decided to take the stand; defendant's jury could not have been properly allowed to remain in the courtroom during that testimony, unless defendant made a specific request to the contrary. Defendant made no such motion here. The only related pretrial motion he made was a motion to admit the extrajudicial statement of Shambley, a motion, for reasons given in Part III, properly denied by the trial court. Defendant cannot now assert as a basis for reversal a position different from the one he adopted in the trial court.

Defendant also contends that the trial court erred in granting the State a continuance because it not did meet the requirements set forth in section 114—4 of the Code. (Ill. Rev. Stat. 1989, ch. 38, par. 114—4.) Defendant, however, has no standing to complain about the propriety of the grant of a continuance in a severed trial of another defendant, especially where Shambley's counsel agreed to the State's request for the continuance.

For all of these reasons, we find no abuse of discretion in the trial court's grant of a continuance to the State in Shambley's trial.

### III

Defendant next complains that the trial court abused its discretion in excluding codefendant Shambley's post-arrest statements regarding what occurred at the scene of the crime. At the police station after he was arrested, Shambley offered two versions of the relevant events. He first stated that he shot Austin because he was pulling a .32- or .38-caliber weapon out of his pocket while he was standing only 5 or 10 feet away from him. In his second statement, he claimed that Austin was not actually in the process of pulling a gun from his pocket, but instead was reaching for his pocket as if he had a firearm there. Defendant argues that he should have been allowed to introduce both of these statements in support of his self-defense claim.

Generally, "[a]n extrajudicial declaration not under oath, by the declarant, that he, and not the defendant, committed the crime is inadmissible as hearsay, even though the declaration is against the declarant's penal interest." (*People v. House* (1990), 141 Ill. 2d 323, 389-90, 566 N.E.2d 259, 289.) However, such declarations may be admitted where justice requires and where sufficient indicia of trustworthiness of the extrajudicial statements exist. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 302, 35 L. Ed. 2d 297, 313, 93 S. Ct. 1038, 1049; *People v. Bowel* (1986), 111 Ill. 2d 58, 66, 488 N.E.2d 995, 999.) In *Chambers*, the Supreme Court set forth four factors which it found

to be indicia of the trustworthiness of such out-of-court statements: (1) the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) the statement is corroborated by other evidence; (3) the statement is self-incriminating and against the declarant's interest; and (4) there is adequate opportunity for cross-examination of the declarant. (*Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49.) The Illinois Supreme Court has held these factors are only indicia of trustworthiness, and satisfaction of each is not a condition of admissibility. (*Bowel*, 111 Ill. 2d at 67, 488 N.E.2d at 1000; accord *House*, 141 Ill. 2d at 390, 566 N.E.2d at 289.) The trial court's determination of whether an extrajudicial statement contains sufficient guarantees of trustworthiness in order to be admissible will not be reversed absent an abuse of discretion. *Bowel*, 111 Ill. 2d at 68, 488 N.E.2d at 1000.

 In the instant case, the trial court, in employing the four factors of *Chambers*, determined that Shambley's statements did not have sufficient indicia of trustworthiness to be admissible. We agree. First, there is no question but that the statements did not comport with the first factor of *Chambers*, as they were not made spontaneously to a close acquaintance, but instead were given to police officers several days after the crime occurred. Second, there is no evidence in the record to corroborate Shambley's account that Austin was the aggressor. Third, we cannot agree that Shambley's statements were against his penal interest, since they were obviously an attempt to exonerate himself from responsibility for shooting Austin. For all of these reasons, we hold that the trial court did not abuse its discretion in excluding Shambley's extrajudicial statements to police officers after his arrest.

IV

Defendant next argues that the trial court erred in prohibiting him from introducing a tape of a CBS interview with Sonny Keeler wherein he stated that he was a member of the War Lords street gang. He asserts that the tape was admissible for all of the following reasons: (1) even though Sonny, while on the witness stand, admitted having made those statements on the tape, it would have emphasized to the jury that Sonny had stated out of court that he was a gang member and drug dealer; (2) it would have impeached Sonny on the issue of whether he was the leader of the War Lords, a statement which he denied making to CBS; and (3) it was admissible as substantive evidence under section 115—10.1 of the Code (Ill. Rev. Stat.

1989, ch. 38, par. 115—10.1). We address each of these contentions *seriatim.*

## A

As to defendant's first claim that he should have been allowed to play the CBS tape for the jury even though Sonny admitted saying almost everything that would have been depicted thereon, we disagree. It is true that a party is not precluded from introducing a witness' prior inconsistent statements simply because the witness admits making those prior statements. (*People v. King* (1986), 109 Ill. 2d 514, 528, 488 N.E.2d 949, 957; *People v. Bradford* (1985), 106 Ill. 2d 492, 500, 478 N.E.2d 1341, 1344; *People v. Williams* (1961), 22 Ill. 2d 498, 504, 177 N.E.2d 100, 103.) However, none of these cases *requires* the trial court to allow successive impeachment; instead, they simply hold that it is not an abuse of the trial court's discretion to allow the intro- . duction of the impeaching statements even though the witness admitted making them. The trial court retains the ability to limit the scope of impeachment, and its exercise of discretion will not be overturned absent an abuse thereof. See *People v. Sandoval* (1990), 135 Ill. 2d 159, 194, 552 N.E.2d 726, 741-42; *People v. Mercado* (1993), 244 Ill. App. 3d 1040, 1050.

■ In the case at bar, we find it to be plain that by obtaining Sonny's admission during cross-examination that he told CBS that he was a gang member and that he monitored the drug trade in the area, defense counsel successfully impeached him on those issues and there was no point in allowing the same impeachment to be fashioned into tiers or layers. Furthermore, whether Sonny was a member of the War Lords after the late 1970's or whether he was actually in charge of the drug trade in the area is indisputably collateral to the crucial issue in this case: whether defendant was responsible for Austin's murder. This is especially true in light of the fact that no evidence whatsoever was presented which indicated that defendant was a member of a rival gang, thus eliminating any possibility that the shooting occurred during a skirmish as part of a larger ongoing gang war. Accordingly, we hold that the trial court did not abuse its discretion in not allowing defendant to impeach Sonny with the CBS tape.

## B

Defendant also asserts that he should have been allowed to introduce the tape in order to impeach Sonny on the issue of whether he was the leader of the War Lords, which, while on the stand, he denied saying to CBS. Defendant does not contend that Sonny ever stated on

the tape that he was the leader of the War Lords; instead, he claims that he should be able to impeach Sonny with his silence when the CBS interlocutor characterized him as the leader of that street gang.

■ Defendant's argument is meritless. It is well settled that a cross-examiner attempting to impeach a witness on a collateral matter must accept the answer given by the witness on cross-examination. (*People v. Collins* (1985), 106 Ill. 2d 237, 269, 478 N.E.2d 267, 281; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §607.2, at 336-37 (5th ed. 1990).) A matter is collateral if it cannot be introduced for any other purpose than to contradict, and that determination is left to the sound discretion of the trial court. (*Collins*, 106 Ill. 2d at 269-70, 478 N.E.2d at 281.) In this case, the question of whether Sonny is or was the leader of the War Lords is plainly collateral to any issue involved in this case; accordingly, the court properly restricted defendant's attempt to bring in other evidence establishing that he was the gang's leader.

Moreover, even if this issue were not collateral, the court still did not abuse its discretion in disallowing defendant's attempted impeachment. It is true that a witness' failure "to state a particular fact under circumstances rendering it incumbent upon him to, or likely that he would, state such fact, if true, may be shown to discredit his testimony as to such fact." (*People v. Henry* (1970), 47 Ill. 2d 312, 321, 265 N.E.2d 876, 882; accord *People v. Shore* (1984), 129 Ill. App. 3d 443, 457, 472 N.E.2d 512, 520-21.) However, a witness may be impeached by his silence only if: (1) the witness had an opportunity to make a statement; and (2) under the circumstances, the witness would normally have made a statement. (*People v. Conley* (1989), 187 Ill. App. 3d 234, 244, 543 N.E.2d 138, 145.) The record before us reveals that the CBS interviewer never actually stated *in Sonny's presence* that he was the leader of the War Lords; instead, his comment was made as an introductory lead to Sonny's interview regarding gang activity in the projects. Accordingly, since Sonny clearly never had an opportunity to comment on the interviewer's characterization of him, we hold that he could not have been properly impeached with his failure to deny the interviewer's assertion.

C

Defendant's final contention as to this issue is that he was the victim of ineffective assistance of counsel because his attorney failed to urge that the tape should have been admitted as substantive evidence under section 115—10.1 of the Code, which states in pertinent part:

"Admissibility of Prior Inconsistent Statements.

In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

\*\*\*

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

\*\*\*

(B) the witness acknowledged under oath the making of the statement \*\*\* in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought \*\*\*." Ill. Rev. Stat. 1989, ch. 38, par. 115—10.1.

■■ Although the CBS tape qualifies as substantive evidence under the above-quoted section, what defendant repeatedly fails to apprehend is that the evidence contained in the tape has no relevance to the issues in this case outside of its impeachment value. Once again, whether Sonny was the leader of the War Lords or a drug kingpin sheds no light whatsoever on the issue of whether defendant was criminally responsible for the murder of Austin. Accordingly, since the trial court clearly and correctly ruled that the evidence in the tape had no probative value other than its impeachment potential, defendant's ineffective assistance claim must fail due to the lack of any possible prejudice resulting from counsel's failure to introduce the tape as substantive evidence.

## V

Defendant next argues that the trial court erred in refusing his self-defense and second-degree murder instructions. An instruction for self-defense should be given in a homicide case where there is some evidence in the record, however slight, which if believed by the jury, would support a claim of self-defense. (*People v. Everette* (1990), 141 Ill. 2d 147, 157, 565 N.E.2d 1295, 1298-99; *People v. Lockett* (1980), 82 Ill. 2d 546, 551, 413 N.E.2d 378, 381.) Moreover, if the evidence supports a self-defense instruction, it will also support a second-degree murder instruction. (*Lockett*, 82 Ill. 2d at 551, 413 N.E.2d at 381.) It is equally well settled, however, that these instructions should not be given if the evidence clearly demonstrates that the crime was murder and there is no evidence upon which a jury might find that

the defendant acted in self defense or was guilty of second-degree murder. *Lockett*, 82 Ill. 2d at 551-52, 413 N.E.2d at 381.

In order to be entitled to a self-defense instruction, a defendant is required to present some evidence on each of the following elements: (1) that force had been threatened against the defendant; (2) that the defendant was not the aggressor; (3) that the danger of harm to the defendant was imminent; (4) that the force threatened to the defendant was unlawful; (5) that the defendant actually believed that a danger existed, that the force was necessary to avert the danger, and that the amount of force used by the defendant was necessary; and (6) that all of the defendant's beliefs were reasonable. (Ill. Rev. Stat. 1989, ch. 38, par. 7—1; *People v. Huddleston* (1993), 243 Ill. App. 3d 1012, 1018, 614 N.E.2d 86, 89; *People v. Jerome* (1990), 206 Ill. App. 3d 428, 432, 564 N.E.2d 221.) Moreover, section 9—2(b) of the Criminal Code provides:

"Second Degree Murder. (a) A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9—1 of this Code [Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2)] and either of the following mitigating factors are present:

\* \* \*

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." Ill. Rev. Stat. 1989, ch. 38, par. 9—2(b)(2).

■ In refusing to give the jury defendant's tendered instructions on self-defense and second-degree murder, the trial court found that there was no evidence that force had been threatened against defendant or that Austin was the aggressor. Defendant argues otherwise, claiming that the following facts in the record constituted "slight" evidence supporting each element of his self-defense claim: (1) that a fully loaded .357 gun was found near a trail of blood at the scene of the crime; (2) that Glover testified that a man who vaguely resembled Austin stole from him the .357 magnum which was found at the scene; (3) that there was an argument between Donnell Keeler and Shambley shortly before the fatal shooting; (4) that Austin had .67 nanograms of morphine in his blood at the time of the shooting; and (5) that Austin went to the project on Evans Street despite being warned that there had just been a shooting there.

We agree with the trial court, for the most that can be reasonably inferred from the foregoing facts is that Austin may have been armed with a weapon when he was gunned down. Even if it could be somehow further inferred that Austin had at some point displayed his weapon, there is no evidence in the record which contradicts Sonny's testimony that when he peered around the corner, Austin was unarmed while defendant, Shambley and Appelby already had their guns drawn, thus foreclosing any possibility that none of these codefendants was the aggressors.

We find the facts in this case to be analogous to those in *People v. Davidson* (1987), 160 Ill. App. 3d 99, 514 N.E.2d 17. In that case, the defendant argued that her conviction under an accomplice theory be reversed and remanded for a new trial because the trial court should have given the jury a self-defense instruction. The defendant attempted to establish her self-defense claim by presenting the testimony of William Gill, the actual perpetrator of the offense who was having an extramarital affair with the defendant at the time. Gill testified that he went to defendant's home in order to confront her husband, the victim, in order to ask that he agree to allow the defendant to divorce him. Gill, who was armed with a pistol in the event that the victim "wanted to start something," entered the home through the garage door which led to the basement. Before entering the basement, he grabbed a piece of wood from a woodpile in the garage, but decided to drop it when he entered the home because he did not want the victim to feel threatened. When the victim encountered Gill in the house, Gill told him that he wanted to discuss the possibility of the victim's giving the defendant a divorce. The victim stated that he would not even consider it and punched Gill in the mouth. A brawl ensued, and Gill testified that the victim was struck by a bullet which discharged from his gun while both men had their hands on it. Gill admitted that once he gained sole possession of the gun, he struck the victim repeatedly on the head with it; he also stated that at some point, he picked up the piece of wood which he had previously dropped and clubbed the victim with it. *Davidson*, 160 Ill. App. 3d at 106-07, 514 N.E.2d at 22-23.

We affirmed the trial court's refusal to give the jury a self-defense instruction based on those facts, reasoning:

> "Gill's own testimony shows that [the victim's] reaction was provoked by defendant's own conduct. Gill's own testimony indicated that he, Gill, was the aggressor. He came to the home armed with a gun. He admitted picking up the piece of wood from a woodpile before entering the home, but then decided to

discard it. He parked his car a mile from the home, then jogged the remainder of the distance so no one would know he was at the home. He testified he knew [the victim] would be upset when confronted about divorcing his wife. Gill admitted he did not have permission to enter the home that night. He did not go to the front door because he knew if [the victim] saw him coming, he would 'slam the door in my face,' so he entered through the garage door and the basement. *** [W]e do not believe that under these circumstances defendant was entitled to instructions regarding self-defense or voluntary manslaughter ***." *Davidson,* 160 Ill. App. 3d at 110-11, 514 N.E.2d at 25.

In the case at bar, we find that it is even more patent than in *Davidson,* where the victim had at least struck the first physical blows, that all three codefendants were the aggressors in this shooting, since there is no evidence whatsoever that Austin provoked them in any way. Instead, the only evidence establishes that all three codefendants, in phalanx formation, had their guns drawn and ready to fire before Austin approached them. Because this testimony stands unrebutted, we hold that the trial court properly refused to give the jury a self-defense instruction.

The case primarily relied upon by defendant, *People v. Robinson* (1989), 189 Ill. App. 3d 323, 545 N.E.2d 268, is clearly distinguishable. It is true that in that case we gave as one of the reasons for our holding that the trial court erred in refusing to give the jury the defendant's self-defense instruction the fact that two knives were recovered from the scene of the crime, which could have indicated that a mutual combat had taken place. However, we also found that the record revealed that: (1) there was a "violent, heated argument between the deceased and her assailant"; (2) the deceased had recently broken off a relationship with the defendant; (3) the deceased was angry with the defendant because he had stolen the rent money from her piggybank to purchase beer; and (4) the deceased and the defendant had had several heated arguments in the past. (*Robinson,* 189 Ill. App. 3d at 351, 545 N.E.2d at 286-87.) Defendant here has presented no evidence even approaching any resemblance to that in *Robinson*; consequently, that case is clearly inapposite to the one before us.

For all of these reasons, we hold that the trial court did not err in declining to instruct the jury on the issue of self-defense.

## VI

Defendant next argues that the evidence introduced against him was insufficient to convict him of first-degree murder based on accom-

plice liability. In *People v. Sutherland* (1992), 155 Ill. 2d 1, 17, 610 N.E.2d 1, 8, our supreme court had occasion to summarize the standard of review which this court must apply to sufficiency of the evidence claims:

"When faced with a challenge to the sufficiency of the evidence, the relevant inquiry for the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citations.] The reviewing courts apply this standard regardless of whether the evidence is direct or circumstantial. [Citations.] This standard of review does not allow the appellate court to 'substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses [citation].' [Citation.] Therefore, [a reviewing] court will not reverse a criminal conviction unless the evidence is so 'unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt [citation].' [Citation.]"

A person is legally accountable for the conduct of another when, either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense. (Ill. Rev. Stat. 1989, ch. 38, par. 5—2(c); *People v. J.H.* (1990), 136 Ill. 2d 1, 17, 554 N.E.2d 961, 968.) Our supreme court, in interpreting this section, has endorsed the "common design" principle of accountability, as set forth in *People v. Perez* (1985), 108 Ill. 2d 70, 483 N.E.2d 250:

" 'Evidence that one voluntarily attaches himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain a conviction as a principal for a crime committed by another in furtherance of the venture. [Citation.] Proof of a common purpose need not be supported by words of agreement but can be drawn from the circumstances surrounding the commission of an act by a group, and the fact that the criminal acts were not committed pursuant to a preconceived plan is not a defense if the evidence indicates involvement on the part of the accused in the spontaneous acts of the group. [Citation.]' " (Emphasis omitted.) *Perez*, 108 Ill. 2d at 82-83, 483 N.E.2d at 255, quoting *People v. Johnson* (1966), 35 Ill. 2d 624, 626, 221 N.E.2d 662, 667.

While a defendant's mere presence at the scene of a crime is insufficient to impose criminal liability (*Johnson*, 35 Ill. 2d at 626, 221 N.E.2d at 663; *People v. Lovelady* (1991), 221 Ill. App. 3d 829, 840, 582 N.E.2d 1217, 1227, *appeal denied* (1992), 143 Ill. 2d 644, 587 N.E.2d 1021), "[a]ctive participation has never been a requirement for the imposition of criminal guilt upon the theory of accountability." (*People v. Reid* (1990), 136 Ill. 2d 27, 61, 554 N.E.2d 174, 190; accord *People v. Johnson* (1991), 220 Ill. App. 3d 550, 554, 581 N.E.2d 118, 122.) Instead, courts have looked to the following factors to determine whether one can be held responsible for the criminal acts of another: (1) presence at the scene of the crime without any negative reaction to it; (2) flight from the scene; (3) continued association with the perpetrators after the criminal act; (4) failure to report the incident; (5) acceptance of illegal proceeds from the actual perpetrators which the accused knew did not belong to those persons; and (6) subsequent concealment or destruction of evidence. *People v. Griffin* (1993), 247 Ill. App. 3d 1, 7; *People v. Haynes* (1991), 223 Ill. App. 3d 147, 150, 583 N.E.2d 1177, 1179; *Johnson*, 220 Ill. App. 3d at 554-55, 581 N.E.2d at 122.

■ Applying these principles to the case at bar, it is ineluctably clear that a rational trier of fact could have found defendant guilty based on an accountability theory. Looking at the evidence in the light most favorable to the State, as we must, the jury could have believed that defendant had his gun drawn waiting to attack as he was lined up in the corridor with Shambley and Appelby. Furthermore, since both Holliday and Sonny testified that it sounded as if the shots were being fired from different guns, the jury could have found that defendant actually shot at Austin, despite his dying declaration that Shambley and Appelby shot him. This is especially true in light of the evidence that defendant participated in the attempted murder of Donnell Keeler just prior to the shooting of Austin. Moreover, we find it to be particularly relevant that defendant admitted that he was at the scene of the shooting and did not display any negative reaction to what was occurring, that he fled from the scene with his two codefendants, and that he did not report the crime to the authorities until several days afterward. In any event, it is plain that the jury could have reasonably found that defendant was much more than an innocent bystander who just happened to be on the scene displaying a weapon when his two codefendants began pumping bullets at Austin. Accordingly, we reject defendant's contention that the State failed to prove him guilty beyond a reasonable doubt on an accountability theory.

## VII

 Defendant next complains that his sentence of 40 years in the custody of the Illinois Department of Corrections was an excessive sentence and urges us to reduce it. Our supreme court has consistently held that the trial court is in the best position to consider matters relating to sentencing and is best suited to tailor a sentence to the needs of the particular case before it. (*E.g. People v. Steppan* (1985), 105 Ill. 2d 310, 323, 473 N.E.2d 1300, 1307; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884.) Consequently, where the sentence imposed is within the statutory limits, the trial court's determination of its appropriateness in a given case is a matter within its sound discretion, and its decision will not be overturned absent an abuse thereof. *People v. Wilson* (1991), 143 Ill. 2d 236, 250, 572 N.E.2d 937, 944; *People v. Cabrera* (1987), 116 Ill. 2d 474, 493-94, 508 N.E.2d 708, 716.

In the case *sub judice*, defendant was convicted of first-degree murder, and the court was required to sentence him to a term of imprisonment between 20 and 60 years. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1).) Although it is true that defendant had no prior criminal record, we cannot say that the trial court's imposition of a term of 40 years' imprisonment was an abuse of its discretion in light of the fact that the evidence showed that the unarmed victim was brutally murdered, having been shot in the face and neck from close range. Accordingly, we decline defendant's invitation to reduce the sentence imposed by the trial court.

## VIII

Defendant's final assignment of error is that the trial court erred in denying his motion for a new trial based on newly discovered evidence, *viz.*, the testimony ascribed to Shambley at his trial that "he acted alone and in self-defense." We find this contention to be meritless. In *People v. Miller* (1980), 79 Ill. 2d 454, 404 N.E.2d 199, our supreme court summarized the criteria to be considered when reviewing a trial court's denial of a motion for new trial:

> " 'A motion for a new trial on the ground of newly discovered evidence is addressed to the discretion of the trial judge and denial thereof will not be disturbed upon review in the absence of a showing of an abuse of discretion. [Citation.] To warrant a new trial, the new evidence must be of such conclusive character that it will probably change the result on retrial, that it must be material to the issue but not merely cumulative, and that it must have been discovered since the trial and be of such character that it

could not have been discovered prior to trial by the exercise of due diligence. [Citations.]' *** 'Applications for a new trial on the ground of newly discovered evidence are not looked upon with favor by the courts, and in order to prevent, so far as possible, fraud and imposition which defeated parties may be tempted to practice, as a last resort, to escape the consequence of an adverse verdict, such application should always be subjected to the closest scrutiny by the court, and the burden is upon the applicant to rebut the presumption that the verdict is correct and to show there has been no lack of diligence. ***' [Citations.]" *Miller*, 79 Ill. 2d at 464-65, 404 N.E.2d at 204.

■■ We hold that the trial court properly denied defendant's motion for a new trial. First and most important, defendant's claim that Shambley testified at his trial that he acted alone is nothing more than a bald, unsubstantiated assertion. We have held that an accused must present affidavits of witnesses who would testify regarding the newly discovered evidence on retrial unless the lack of affidavits is sufficiently explained. (*People v. Blount* (1991), 220 Ill. App. 3d 732, 744, 580 N.E.2d 1381, 1389, *appeal denied* (1992), 143 Ill. 2d 640, 587 N.E.2d 1017.) Here, no affidavits were attached to defendant's post-trial motion, nor was any explanation for their absence provided. Moreover, even if an affidavit from Shambley could not have been obtained, defendant surely could have included a copy of the transcript containing his trial testimony wherein he allegedly stated that he acted alone in shooting Austin.

Additionally, we hold that defendant failed to exercise due diligence in attempting to obtain the evidence before trial. It is undisputed that he did not even attempt to call Shambley at trial and that, as discussed in Part II, defendant sought and received a severance and never indicated in the trial court a desire to have Shambley testify at his trial. The trial judge understandably met with the same credibility problem, a matter, it goes without saying, for his exclusive resolution.

Accordingly, we hold that the trial court did not abuse its discretion in denying defendant's post-trial motion for a new trial based on newly discovered evidence.

For all of the foregoing reasons, we affirm defendant's conviction and sentence.

Affirmed.

McCORMICK, P.J., and DiVITO, J., concur.