2022 IL App (3d) 200430

Opinion filed November 30, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0430 Circuit No. 18-CF-227 |
| JERMONTAY J. BROCK, | ) ) ) | Honorable Paul P. Gilfillan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HAUPTMAN delivered the judgment of the court, with opinion.
Justice Daugherity concurred in the judgment and opinion.
Justice Peterson specially concurred, with opinion.

**OPINION**

¶ 1          Following a jury trial, defendant, Jermontay J. Brock, was convicted of three counts of

first degree murder and one count of aggravated battery. Defendant was sentenced to 60 years'

imprisonment. In this direct appeal, defendant contends the Peoria County circuit court violated

his right to present a complete defense and challenges the propriety of his sentence. We affirm.

I. BACKGROUND

¶ 3 The State charged defendant by indictment with, *inter alia*, the first degree murders of Anthony Polnitz[1] (720 ILCS 5/9-1(a)(1), (2) (West 2018)) and Nasjay Murray (*id.* § 9-1(a)(2)) and aggravated battery pertaining to Brittney Morris (*id.* § 12-3.05(e)(1)). Defendant's case proceeded to a jury trial on July 20, 2020.

¶ 4 A. Jury Trial (State's Case)

¶ 5 Peoria police officer Brian Moore testified that on April 8, 2018, at approximately 1:45 a.m., he was dispatched to the 1800 block of Bradley Avenue after receiving a report of shots fired. Upon arrival, Officer Moore observed student-age individuals running everywhere. Officer Moore encountered a female who had sustained a gunshot wound to her hand and learned that the gunshots were fired during a house party at 1821 West Bradley Avenue. Officer Moore assisted officers in clearing the house and checking for victims. Inside the house, Officer Moore discovered two deceased individuals.

¶ 6 Brittney Morris testified that she was a student at Bradley University in April 2018. On the night of the shooting, Morris attended a house party at the Alpha fraternity, which was located at 1821 West Bradley Avenue. Morris recalled that she was one of the first to arrive at the party between 10:30 p.m. and 11 p.m. Later, the house became crowded, and partygoers were shoulder to shoulder. Moments before the shooting, Morris was sitting on a couch in the living room, a few feet away from the front door. Morris estimated that more than 50 people were in the living room. After hearing a gunshot, Morris got down on the floor, and everyone ducked and started running. As Morris pushed toward the front door, she sustained a gunshot wound to her left hand. Morris heard six or seven gunshots in total. Morris did not see the person who was

___

[1]Polnitz was often referred to as AJ at trial.

shooting. When asked if she saw anything at all, Morris responded that she saw "dreads" and the flash from a gun.

¶ 7    After escaping from the house, Morris was transported to the hospital by ambulance. Later that morning at the hospital, Morris spoke with a police officer. Morris also gave an interview at the Peoria Police Department that same morning. The following exchange between the State and Morris occurred regarding the interviews:

"Q. Okay. And, when you were interviewed at the hospital and at the police station later, did you tell both the officer at the hospital and the detective at the station that the shooter had dreads?

A. Yes.

Q. Okay. Can you explain for us why is it you told the officer that the shooter had dreads if, in fact, you didn't see someone actually with dreads holding a gun?

A. I'm not sure.

Q. Was there, were the dreads near the flash?

A. Yes."

¶ 8    On cross-examination, Morris testified further about her interview with Peoria detective Roberto Vasquez on April 8, 2018, at the Peoria Police Department, and the following exchange occurred:

"Q. So, when you talked to him, this was at a time where this was pretty fresh in your mind what had happened, correct?

A. Correct.

Q. This was within a day of the actual shooting, within hours, correct?

A. Correct.

Q. And the detective asked you certain questions about what happened. Do you remember that?

A. Yes.

Q. In fact, he told you that the entire interview that you were having was being video and audio recorded, correct?

A. Correct.

Q. So, isn't it true that at a certain point in that interview he asked you, so, just tell me how things progressed into the shooting? Do you remember that question?

A. Yes.

Q. Isn't it true you responded me and Nina were just on the couch. People were dancing. We heard shots fired. Everybody got on the floor. A bunch of people started running. I ran toward the front door first because that was closest. Did you say that?

A. Yes.

Q. So, in fact, at some point, it's true that you did go toward the front door, correct?

A. Correct.

Q. And is it true then that the shooter was there?

A. Correct.

Q. And it's, also, true that you saw the shooter, correct?

A. No.

Q. Well, isn't it true that during that same interview with Detective Vasquez that we were just talking about, isn't it true he asked you if you saw the shooter and you told him, yes, you did?

A. No.

Q. Okay. Isn't it true that he then asked you, did you observe the hair of this person?

A. Correct.

Q. Okay. Did you observe the hair?

A. Yes.

Q. Is it true that person had dreads? Correct?

A. Correct.

Q. And it's true that these dreads came down to approximately shoulder length, maybe just above the shoulder, correct?

A. Correct.

Q. And in fact, the dreads were long enough that you weren't able to see this person's face, correct?

A. Correct.

Q. His hair was mostly covering his face, is that fair to say?

A. Yes.

\*\*\*

Q. (By [defense counsel]) As far as this individual, is it true to say that he was about 6'2"?

A. I don't recall.

Q. You don't remember?

A. No.

Q. Let me ask you this: Once again, I'm gonna reference this interview you had shortly after the event with Detective Vasquez. Isn't it true during that interview he asked you, remember how tall he was? He asked that question, didn't he?

A. Yes.

Q. And isn't it true you responded 6'2"?

A. I guess.

Q. And then isn't it true during that line of questioning with Detective Vasquez, once you said 6'2", he actually stood up. He stood up. He said, so, I'm about 6'2". I'm shrinking as I get older. About my height? And you responded, yeah. Isn't that correct?

A. Correct.

Q. Do you remember that or not now?

A. No.

Q. Now, it's true that there was only one person shooting, correct?

A. I'm not sure, but I would assume so.

Q. I'm sorry?

A. I said I'm not sure, but I would assume so.

Q. Okay. Do you remember during that interview with Detective Vasquez he asked you do you think anyone else was shooting or do you think it was only one shooter? You responded, it was just one. Do you remember saying that?

A. Yes.

Q. Yes?

A. Yes.

Q. Now, again, back to your testimony today that you didn't see the actual person firing the shots, do you remember before speaking with Detective Vasquez, you spoke to a police officer and that was while you were still I believe at the hospital by the name of Andrew Smith? Do you remember speaking to the police officer?

A. Yes.

Q. Isn't it true that that police officer asked you, he asked you if you could describe the shooter, and you stated that it was a black male wearing a green jacket or hoodie and fired a silver handgun? Do you remember saying that?

A. No.

Q. Do you remember saying to that officer during that questioning that, you stated that the suspect had chin to shoulder length dreads and was in his early twenties and was around 5'6" to 5'9" and was skinny?

A. No.

\* \* \*

7

Q. So, I'm trying to understand this. You claim today that you didn't see the shooter, but you acknowledged that you gave descriptions about—

* * *

Q. (By [defense counsel]) You acknowledge you told them that you saw the shooter, correct?

A. I don't recall.

Q. You were giving a pretty much detailed description of this person that you said was the shooter, isn't that correct?

A. No."

¶ 9    On redirect, Morris clarified that she saw a male with dreads near the muzzle flash and that it was very dark in the room. Morris agreed that she was trying to help the officers and assumed the shooter may have had dreads because she saw an individual with dreads near the muzzle flash. Morris described the injury she sustained as scary and upsetting, and she believed that the interview at the hospital occurred at approximately 6 a.m. the next morning. Morris was not sure whether she told Officer Smith that she saw the shooter at that time.

¶ 10    During a break, defense counsel argued before the court that Morris made several video-recorded statements during her interview with Detective Vasquez that were contrary to her testimony at trial. Counsel pointed to Morris's in-court testimony that she did not see the shooter and claimed the testimony was contrary to Morris's prior descriptions of the shooter. Though counsel agreed that Morris acknowledged her prior statements, counsel wished to publish Morris's recorded statement as substantive evidence of her prior inconsistent statements so that the jury was "not left with this question about did she actually see the shooter because she's very sure about the description she is giving." The State argued Morris already perfected her own

8

impeachment, thus, further impeachment was unnecessary. The court ruled that the defense would not be allowed to publish the recorded statement. However, the court permitted defense counsel to read the impeaching portions of Morris's in-court testimony during closing argument, such that the defense could highlight their point that Morris impeached herself. Further, the court would permit the defense to cross-examine Detective Vasquez regarding Morris's statements during the interview.

¶ 11 Elizabeth Porras testified that she was a student at Bradley University in April 2018 and was a close friend of Murray. Porras attended the house party with Murray, where the pair stood by the wall to the right of the front door. Suddenly, Porras heard two to three gunshots to her left and felt the heat of a gun on her hands. It was too dark to see the shooter, and the room was very crowded. Porras identified People's exhibit No. 6 as a video she had taken at the party moments before the shooting. The exhibit was admitted and published to the jury. The exhibit generally depicted a house party that was crowded, raucous, and dark. On cross-examination, Porras testified that she told an officer during an April 8, 2018, interview, that the shooter was a dark-skinned male wearing dark clothing and was approximately five feet, eight inches, to five feet, nine inches.

¶ 12 Peoria police officer Jacob Willis testified that he received a call regarding the discovery of a firearm in a ditch near the 2900 block of West Nebraska Avenue several days after the shooting. Officer Willis discovered that the firearm was a .40-caliber Glock 22. The Glock 22 was jammed and had a 30-round magazine that extended past the handle.

¶ 13 Peoria police officer David Buss testified that he took photographs of the scene, which were admitted into evidence as People's exhibit Nos. 7 through 44. Officer Buss located four shell casings and two fired projectiles at the scene. Officer Buss later received the Glock 22 from

9

Officer Willis. The Glock 22 was admitted into evidence as People's exhibit No. 64. Officer Buss located blood on the Glock 22.[2] Officer Buss did not locate any fingerprints suitable for comparison on the Glock 22.

¶ 14      Firearms examiner Jason List testified that he examined the shell casings, fired bullets, and the Glock 22 that was recovered. List found that the shell casings and fired bullets were all .40-caliber and that they were fired from the Glock 22.

¶ 15      Forensic scientist, Ann Yeagle, testified that she analyzed the deoxyribonucleic acid (DNA) samples taken from defendant, Polnitz, and Murray and compared them to swabs from the Glock 22. Yeagle concluded that a mixture of at least four individuals' DNA profiles were present on the grip of the Glock 22. Yeagle was unable to find a single profile sufficient for comparison. However, Polnitz's DNA profile matched all 23 loci of that DNA swabbed from the reddish/brown stain near the muzzle of the gun. Yeagle described this match as exact, statistically relevant, and discerning.

¶ 16      Amanda Youmans, a physician specializing in forensic pathology, testified that she performed the autopsies of Polnitz and Murray. Youmans concluded that multiple gunshot wounds to Polnitz's face and back caused his death and that a single gunshot wound to Murray's head caused her death.

¶ 17      Terry Moss testified that he was currently in federal custody, having pled guilty to charges stemming from a gang conspiracy. Moss testified that he became a Bomb Squad gang member at the age of 12. Moss described the Bomb Squad as a gang of more than 50 individuals that operated in the south end of Peoria. During his time with the gang, Moss saw hundreds of

---

[2]People's exhibit No. 68 was a photograph that depicted reddish/brown staining near the muzzle of the Glock 22.

10

firearms, many of which did not belong to any specific individual and were instead shared among gang members. Moss attended the house party on April 8, 2018. Moss recalled that defendant, another Bomb Squad member, was at the party standing on a couch in the living room.[3] Moss and defendant were from the same neighborhood. Moss observed that defendant had a gun with a long magazine on his hip, which Moss described as a "30." Moss had seen the gun before and stated that it belonged to Kenwan Crowe, another Bomb Squad member.

¶ 18    Moss witnessed Polnitz and Byrune Linwood enter the party. Moss did not know Polnitz personally but knew he was a member of Mo Block, a rival gang. Moss watched as defendant "got down off the couch and that's when the shots happened." Defendant's hand was on the gun, which was in his waistband, as he got off the couch. Moss did not see defendant point the gun. Moss recognized the Glock 22 depicted in People's exhibit No. 64 as a "30" and explained that this gun was similar to the gun he saw in defendant's waistband.

¶ 19    The day after the shooting, Moss and two other Bomb Squad members drove defendant to Crowe's house. Approximately 15 Bomb Squad members were present. Defendant explained to the group that he shot Polnitz in the head. Defendant stated that "when he shot [Polnitz] in the head, [Polnitz] grabbed, he said [Polnitz] tried to grab him or something like that." Defendant stated that Polnitz's blood was all over defendant's clothes and the gun. Moss admitted that he was questioned at the police station the day after the shooting but did not relay these details to the detectives.

¶ 20    On cross-examination, Moss clarified that the detectives never asked him about defendant during questioning and that he did not relay to them that defendant was present at the party or that defendant was the shooter. Moss identified defense exhibit No. 1 as a photograph of

_____

[3]Defendant was repeatedly referred to at trial as "OC."

Kentrevion Watkins, a/k/a "TuTu," another Bomb Squad member. Moss agreed that Watkins had shoulder length dreadlocks in the photograph and that several Bomb Squad members had dreadlocks. Moss identified defense exhibit No. 2 as a video depicting Watkins holding Crowe's "30" gun and testified that he had seen Watkins with the gun on numerous occasions.

¶ 21 On redirect examination, Moss provided that the video depicted in defense exhibit No. 2 was taken approximately 30 days before the shooting. Moss further clarified that he saw defendant, not Watkins, with the gun on the night of the shooting. Moss did not see Watkins at the party.

¶ 22 Peoria police detective Matthew Ray testified that he worked on a Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) task force. On April 9, 2018, Detective Ray met with Jordan Timothy, who worked as a confidential informant for the ATF. Timothy had relayed to another agent that he had information regarding the shooting. Based on Timothy's statements, ATF agents obtained an overhear warrant. Detective Ray assisted with putting audio and video wires on Timothy. That same day, several agents and officers tailed Timothy, who picked up Roberico Alston and drove to the address where defendant was residing on Millman Street. After 10 to 15 minutes had passed, Timothy returned to the agents with an audio recording. Detective Ray identified People's exhibit No. 70A as the recording of the conversation between defendant, Timothy, and Alston.

¶ 23 Peoria police sergeant Erin Barisch testified as an expert in gang crimes and violence. Sergeant Barisch described the Bomb Squad and Mo Block gangs as prevalent in the Peoria area. Sergeant Barisch testified that it was typical of gang members to share their firearms with other members. Sergeant Barisch was familiar with defendant, having seen or interacted with him on more than 100 occasions, and knew defendant was a Bomb Squad member in 2018. Sergeant

12

Barisch had also known Polnitz since he was young. Polnitz had positioned himself to be one of the leaders of Mo Block. Sergeant Barisch opined that a rival gang member would gain notoriety from killing Polnitz.

¶ 24      On April 9, 2018, Sergeant Barisch helped coordinate the recording of the conversation between defendant, Timothy, and Alston. Sergeant Barisch testified that that afternoon, Timothy and Alston drove to 2209 West Millman Street, where defendant and his mother lived. Sergeant Barisch observed as defendant exited his residence and got into the back right seat of the vehicle. After approximately 25 minutes, defendant exited the vehicle, and Timothy drove away. Later, Sergeant Barisch listened to People's exhibit No 70A, the recording of the conversation. Sergeant Barisch was familiar with the voices of defendant and Timothy. Sergeant Barisch testified that there was no doubt defendant was speaking to Timothy on the recording.

¶ 25      On cross-examination, Sergeant Barisch identified defense exhibit No. 1 as a photograph of Watkins, who had dreadlocks. Sergeant Barisch stated that Watkins was approximately six feet tall.

¶ 26      Timothy testified that he was in federal custody after having pled guilty to racketeering charges and was hoping his cooperation in the instant case would benefit him at sentencing.[4] Timothy testified that he was a member of the Bomb Squad in 2018. Timothy knew defendant well and occasionally hung out with defendant. Bomb Squad members frequently shared guns. If a member needed a gun, they could call another member to obtain one.

¶ 27      Timothy received a Facebook message from defendant on April 8, 2018, the day before the overhear conversation between defendant and Timothy was captured. Defendant said he

_____

[4]Timothy later clarified that he had previously testified against other Bomb Squad members in federal court pursuant to an agreement with the federal government. Timothy testified that he did not expect to get a lesser sentence based on his testimony in the instant case.

13

needed to speak with Timothy. Accordingly, Timothy clarified he spoke with defendant in his car on two occasions. On the first occasion, defendant stated that at the party, "he killed dude [Polnitz] and the females that was with him." Defendant said he shot them. Defendant stated that the gun was a "stick," meaning it had an extended magazine. Defendant stated that the gun belonged to Crowe. Defendant bragged about the shooting, telling Timothy that he shot Polnitz in the head and that Polnitz grabbed his legs, so defendant "put a gun to his back." Timothy reported this initial conversation to ATF agent Kevin Brown. Timothy explained that he became a confidential informant for the ATF following his release on bond from federal custody in October 2017. Timothy was occasionally paid to provide information but was not paid on this occasion. Timothy was subsequently asked to wear a wire.

¶ 28      On April 9, 2018, Timothy and Alston met with defendant on Millman Street. Timothy was wearing a wire. Timothy spoke with defendant in Timothy's car in front of defendant's home. Timothy was instructed not to bring up the shooting on his own. During the conversation, defendant talked about the shooting, where he shot Polnitz, that a female was also shot, and that he used Crowe's gun. Timothy identified People's exhibit No. 70A as the recording of the conversation, and the exhibit was admitted into evidence and published to the jury.[5]

¶ 29      During the conversation between Timothy, Alston, and defendant, defendant made several incriminating admissions. Defendant stated that he shot Polnitz in the head twice and once in the back and that there was blood all over the gun. Defendant stated that Murray's death was accidental and that he believed one bullet traveled through Polnitz's head, striking Murray. Defendant stated that after the shooting, he and "TuTu," meaning Watkins, put the gun "up."

---

[5]Jurors were also provided a transcript of the conversation.

During the recording, Alston can also be heard assisting defendant with his Facebook account because defendant had posted about the incident. Periodically, the State paused the recording and asked Timothy to clarify certain statements made by defendant. Timothy explained that "put it up" meant to throw the gun somewhere so that the police would not find it. Timothy also explained that defendant's reference to the "30" meant a gun with an extended magazine. Timothy also confirmed several statements made by defendant regarding defendant's descriptions of the shooting.

¶ 30    On cross-examination, Timothy testified that defendant looked up to him. Timothy stated that during his initial conversation with defendant, defendant stated that he had to shoot one of the females because she was a witness. Timothy identified defense exhibit No. 1 as a photograph of Watkins with a dreadlock hairstyle. Timothy explained that Watkins had dreadlocks in April 2018, and that Watkins was approximately six feet, two inches. Defendant did not have dreadlocks in April 2018, and instead had short hair.

¶ 31    Peoria police officer Morris Franklin testified that he assisted in defendant's arrest on April 11, 2018. At the time of his arrest, defendant was wearing light olive-green cargo pants. Officer Franklin did not recall defendant having dreadlocks.

¶ 32    Peoria police officer David Logan testified that he also assisted in defendant's arrest and that he recovered a cell phone from defendant's person. Officer Logan identified People's exhibit No. 74 as a phone similar to that recovered from defendant's person and testified that he turned the cell phone over to Detective Vasquez.

¶ 33    The parties stipulated that if called, Peoria police detective Jim Feehan would testify that he forensically extracted data from the cell phone depicted in People's exhibit No. 74. Detective

15

Feehan would further testify that People's exhibit No. 78B represented a printout of photographs extracted from the phone.[6]

¶ 34    Brett Jones testified that he took an inventory of defendant's personal belongings following defendant's arrest. Jones identified People's exhibit No. 80 as the inventory of defendant's personal belongings, which included, *inter alia*, a gold-like bracelet.

¶ 35    Detective Vasquez testified that he was the lead detective on the case. Detective Vasquez interviewed defendant on April 11, 2018, following his arrest. Defendant denied involvement in the shooting. Detective Vasquez played a portion of the overhear recording for defendant, but defendant denied that his voice could be heard on the recording.

¶ 36    Detective Vasquez testified that the shooting was the subject of significant media attention, however, he retained some control over what information was shared with the public. Detective Vasquez explained that the department's public information officer gathered general information from Detective Vasquez regarding the factual basis of the incident. This officer then released this general information. However, members of the public were not privy to information regarding the specific gunshot injuries Polnitz and Murray sustained or the manner in which they received those injuries.

¶ 37    Later in the investigation, Detective Vasquez reviewed the contents of defendant's cell phone and discovered a photograph taken on the morning of the shooting depicting a black male "wearing green, almost like a camouflage-ish pant with a firearm tucked in the waistband with an extended magazine sticking out with his hand over it." Detective Vasquez testified that this photograph was time stamped on April 8, 2018, at 2:25 a.m. and that the first call regarding the

---

[6]People's exhibit No. 78B contained approximately 30 photographs.

shooting was received at 1:44 a.m. Detective Vasquez identified a photograph depicting a black male's hand with a gold bracelet on the wrist, green "camouflage style" pants, a gun with an extended magazine in the waistband, blue underwear, and a light-colored shirt. The man had a light scar on top of his right hand. Defendant displayed his right hand to the jury by placing his hand on the overhead projector. Detective Vasquez also identified photographs of defendant wearing a gold necklace and a gold bracelet and of defendant's hand bearing a mark consistent with the aforementioned scar. Defendant was wearing the same green pants depicted in several exhibits when he was taken into custody.[7]

¶ 38       As part of his investigation, Detective Vasquez also spoke with Jorell Wilson, who had seen an individual with dreadlocks at the party and assumed they were the shooter. The videotaped recording of Detective Vasquez's interview with Wilson was admitted as Defense exhibit No. 3 and published to the jury.

¶ 39       On cross-examination, Detective Vasquez recalled that he interviewed Morris at the Peoria Police Department after she left the hospital. Morris described the shooter to Detective Vasquez, but Detective Vasquez did not recall referencing his own height relative to that of the shooter during this interview. To Detective Vasquez's knowledge, defendant did not have dreadlocks at any time. Detective Vasquez believed defendant was between five feet, five inches, and five feet, seven inches, tall.

¶ 40       The State rested following Detective Vasquez's testimony.

¶ 41                          B. Jury Trial (Defense Case)

¶ 42       Wilson testified that he was a student at Bradley University in April 2018. Wilson attended the dark and crowded party in question with four friends. After some time, Wilson sat

---

[7]People's exhibit No. 78B was admitted into evidence.

down on a chair in the middle of the room. Several minutes later, Wilson saw muzzle flashes, and everyone dove to the floor. Wilson heard six to eight gunshots but did not see the shooter's face. The day after the shooting, a Bradley University police officer drove Wilson to the Illinois Eyecare Center.[8] Wilson did not recall telling this officer that he saw a tall male with dreadlocks when the gunshots were fired. Wilson did not recall stating that he could see this person because of the light created by the gunshots. Wilson further testified that he gave a videotaped interview at the Peoria Police Department, and the following exchange occurred:

"Q. Okay. And when you spoke with Detective Vasquez, do you remember telling him that it was completely dark in the party, but you're pretty sure he, being the shooter, had dreads?

A. I remember saying something like that to, yeah, to the detective. I don't remember talking about it that much with the police, with the Bradley police officer, but I don't remember that conversation that much. I remember telling the detective that.

Q. Detective Vasquez?

A. Yes.

Q. And did you tell him that you couldn't put a face to him, but he had to be dark complected and it was completely dark?

A. Yes. I remember saying that.

Q. Detective Vasquez asked you, so you're not sure if he had dreads; and you responded, yeah, right. Do you remember saying that?

_____

[8]Though Wilson could not recall the officer's name, the evidence at trial established that Bradley University police officer Matthew Gamma drove Wilson that day.

A. I don't remember saying that, but maybe we can watch the video or something. I don't know whether I said that or not.

Q. Do you remember Detective Vasquez or did Detective Vasquez say, you're just assuming, and you responded, yeah?

A. I don't know. Maybe I said that.

Q. And do you remember being asked the question: Do you remember if any of the other guys with him—presumably being the individual you're speaking about—had dreads?

A. Um-hmm.

Q. You answer: So the guy that he was like whispering with, he had black dreads. Do you remember saying that?

A. I don't remember saying that.

\* \* \*

[DEFENSE COUNSEL]: Do you remember being asked: Do you remember how long the dreads were?

A. I don't remember.

Q. You don't remember how you answered that?

A. I don't remember that being asked, and I don't remember answering that.

Q. So, you don't remember whether you said, uh, they were about like, then motioned to your shoulder, and said not past his neck, to his neck?

A. Okay. That sounds familiar. But I don't remember what I said. I remember talking about, like motion to my shoulder or something like that.

19

Q. Do you remember being asked whether the individual you were speaking about was standing alone?

A. I do not remember."

¶ 43 On cross-examination, Wilson testified that prior to the gunshots, he observed a group of males, one of whom had dreadlocks. None of the males appeared to be Bradley University students. The male with dreadlocks pointed in Wilson's direction. Wilson stated, "[t]hat didn't give me the best feeling, but I'm not saying that was the shooter. It was just kind of weird seeing that." At some point prior to the shooting, the male with dreadlocks bumped into Wilson. Wilson did not recall stating during his interview with Detective Vasquez that the individual's dreadlocks were styled "two on each side." Wilson did not recall stating during the interview that he was not sure if the shooter had dreadlocks.

¶ 44 The parties stipulated that if called as a witness, Bradley University police officer Matthew Gamma would testify that on April 9, 2018, Wilson told him that "when the shots went off he could tell that the male was tall and had dreads."

¶ 45 Peoria police detective Andrew Smith testified that he spoke with Morris at the hospital in the early morning hours of April 8, 2018. Morris described the shooter as a black male in his early twenties, wearing a green jacket or hoodie and firing a silver handgun. Morris described the male as being skinny, around five feet, six inches, to five feet, nine inches, and as having chin to shoulder length dreadlocks. On cross-examination, Detective Smith testified that Morris was in a hospital bed during the interview and that the circumstances of the interview were not ideal. The defense rested following Detective Smith's testimony.

¶ 47        During closing argument, defense counsel highlighted the inconsistencies between Morris's pretrial statements and her in-court testimony concerning the physical characteristics of the shooter. For instance, defense counsel argued:

> "[t]hen [Morris] comes in here—I don't know why she says all of a sudden, no, I didn't see the shooter. But you heard from several individuals, several police officers including Detective Vasquez—and Brittney Morris admitted a lot of this—that she described the shooter to him. This is a girl who they had an opportunity to ask her why is it you went right down to the police station. Were you tired? Were you fatigued? No questions about that.
>
> Presumably she was, but there were no questions asked about that. There were no questions asked about why it is that she is now giving a different story. So she took the witness stand and she admitted that she told the detective that he was 6'2" and had shoulder length dreadlocks."

Defense counsel argued Wilson's pretrial statements and his in-court testimony were inconsistent regarding whether he viewed the shooter and whether the shooter was tall and had dreadlocks. Defense counsel further pointed to Moss's testimony that he had seen Watkins in possession of the murder weapon on previous occasions. Based on these statements, counsel argued that Watkins, who was taller, had dreadlocks, and had previously possessed the murder weapon, was the shooter.

¶ 48        Following closing arguments, the court instructed the jury as follows:

> "[t]he believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his

testimony in this case. Evidence of this kind ordinarily may be considered by you only for the limited purpose of deciding the weight to be given to the testimony you heard from the witness in the courtroom.

However, you may consider a witness's earlier inconsistent statement as evidence without this limitation when the statement narrates, describes, or explains an event or condition the witness had personal knowledge of and the statement was accurately recorded by a tape recorder, videotape recording, or a similar electronic means of sound recording.

Additionally, you may consider a witness's earlier inconsistent statement as evidence without this limitation when the statement narrates, describes, or explains an event or condition the witness had personal knowledge of and the witness acknowledged under oath that he made the statement.

It is for you to determine what weight should be given to that statement. In determining the weight to be given to an earlier statement, you should consider all of the circumstances under which it was made."[9]

¶ 49    The jury found defendant guilty on all three counts of first degree murder and one count of aggravated battery. Additionally, the jury found that defendant personally discharged a firearm that proximately caused the death of another person.

¶ 50                                D. Posttrial/Sentencing

¶ 51    On September 18, 2020, defendant filed a motion for a judgment notwithstanding the verdict and/or for a new trial. In the motion, defendant argued, *inter alia*, that the court erred in

---

[9]These instructions were also provided to the jury in written form.

denying him the opportunity to admit portions of witnesses' recorded statements as substantive evidence. The court denied defendant's motion, finding its prior rulings were proper.

¶ 52        Defendant's presentence investigation report (PSI) revealed that defendant was 16 years old on the date of the offenses. The PSI documented defendant's prior delinquency and criminality. Defendant had a history of ordinance violations, having been convicted of multiple curfew violations, littering, obstructing a public way, and spitting. In May 2014, defendant was sentenced to two years' probation on a felony mob action offense. Defendant's probation was terminated unsuccessfully after defendant committed the subsequent offenses of felony unlawful possession of a stolen vehicle and burglary in November 2014. In January 2015, defendant was sentenced to five years' probation, *inter alia*, for those offenses. By May 2015, defendant had missed five probation appointments, had tested positive for cannabis, was not attending school, and had been charged with misdemeanor domestic battery and criminal damage to property. In June 2015, defendant was charged with felony aggravated battery. Defendant was removed from his home and committed to the Illinois Department of Juvenile Justice (IDJJ) on October 2, 2015. Defendant was released from the IDJJ and subsequently recommitted on three separate occasions between 2016 and 2018, due to violations of his terms of release. Notably, defendant was released from IDJJ on February 22, 2018, and was arrested for the instant offenses on April 11, 2018.

¶ 53        Regarding defendant's educational history, the PSI documented that defendant's highest level of education was fifth grade, which he attended at least four times. Defendant received multiple suspensions. Due to his lack of attendance at school, defendant was not found eligible for any form of special education. Defendant reported to the interviewer that he had enough credits to be considered a junior in high school, but no records were received to verify this claim.

23

Defendant had no income or assets and had never been employed. Defendant denied being a member of the Bomb Squad.

¶ 54        Defendant's family members, including his mother, father, brothers, and sisters had criminal histories, and some were currently incarcerated. Defendant and his siblings were removed from his mother's care by the Department of Children and Family Services (DCFS) due to neglect allegations in 2004, when defendant was approximately four years old. Defendant was returned to his mother's care three-and-a-half years later. Defendant lived with his mother in Peoria prior to the instant offenses.

¶ 55        Regarding substance abuse, defendant reported that he thought he had an alcohol problem and began experimenting with cannabis at the age of 10. Defendant completed an outpatient drug treatment program in July 2014. Defendant had previously received mental health counseling on two occasions: the first for being a victim of sexual assault at the age of four, and the second due to defendant witnessing his two-year-old niece being struck and killed by a vehicle. A psychological evaluation conducted in April 2014, listed the psychologist's "diagnostic impressions" that defendant suffered from oppositional defiant disorder, borderline intellectual functioning, and a parent-child relational problem. While in the Peoria County jail awaiting trial, defendant reported that he received counseling for anxiety and anger issues. Defendant had previously considered suicide but had no current thoughts about harming himself. Attached to the PSI were voluminous incident/disciplinary records from the juvenile detention center and the Peoria County jail, a report from the IDJJ, and school and disciplinary records from Peoria School District 150.[10]

---

[10]These records totaled more than 500 pages.

24

¶ 56    At the start of sentencing, the circuit court noted that due to defendant's age at the time of the offenses, and the recent and developing case law regarding mandatory or *de facto* life sentences for juveniles, the court was required to make factual findings regarding, *inter alia*, defendant's youth, maturity, and potential for rehabilitation. The court instructed that a sentence exceeding 40 years should be reserved for the rarest juvenile offenders and could only be imposed after the court made findings of irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court confirmed the parties' agreement that defendant would be sentenced on counts I and III. Both counts had sentencing ranges of 20 to 60 years, with the possibility of discretionary 25-years-to-life firearm enhancements. The sentences were to be served consecutively.

¶ 57    Natalie Hilton, Murray's mother, testified that Murray's death affected her family greatly and described her life following Murray's murder as a nightmare. Caroline Alexander, defendant's mother, and Lamia Doueihi, defendant's girlfriend, testified in mitigation on defendant's behalf.

¶ 58    During argument, the State noted that the PSI, which included nearly 500 pages of incident reports, demonstrated that defendant was not a good person. The State argued that factors such as defendant's age, family history, and peer pressure bore less weight in this case relative to the severity of the offenses. The State argued that defendant was among the rarest juvenile offenders in that his conduct, history, and attitude constituted irretrievable depravity.

¶ 59    Defense counsel argued that the nine mitigating factors contained within section 5-4.5-105(a) of the Unified Code of Corrections weighed in favor of imposing sentences at the low end of the applicable sentencing range. 730 ILCS 5/5-4.5-105(a) (West 2020). In so arguing, counsel

25

highlighted defendant's age, life circumstances, diagnosed disorders, and stated that defendant did not intend to kill Murray. Defendant declined to make a statement in allocution.

¶ 60    The court noted its consideration of the PSI, the evidence, the arguments of the parties, the statutory factors in aggravation and mitigation, and the history and character of defendant. The court explained that it had considered all the relevant statutory sentencing factors, even if the court failed to mention a factor specifically. The court categorized defendant's PSI as the largest it had ever encountered and covered several sections of the PSI in detail. The court recited defendant's school records, which included, *inter alia*, defendant not attending classes, using gang language and symbols, throwing furniture, pushing a teacher, fighting, threatening others, stealing property, and bringing a look-alike gun to school.

¶ 61    The court acknowledged the fact that the brains of juveniles are not fully developed and that for this reason, instead of being sent to jail, defendant spent considerable time in the juvenile detention center for the crimes he committed as a minor. However, the court found that defendant did not utilize his time in juvenile detention to rehabilitate himself. Instead, defendant engaged in, *inter alia*, throwing fecal matter on others and staff, destroying property, using gang signs and gestures, riotous behavior, resisting restraints, making numerous threats, and fighting other detainees. The court further cited records documenting that upon defendant's transfer to the Peoria County jail when he turned 18 years old, defendant attempted to become a "tier boss" and to "rule the cellblock."

¶ 62    The court detailed its consideration of the mitigating factors present in section 5-4.5-105(a), which included findings that defendant had a troubled family history, had received mental health counseling, was the victim of sexual assault, received a diagnosis of oppositional defiant disorder, and had borderline intellectual functioning. The court considered defendant's

26

youth, maturity, and other youthful characteristics and described defendant's actions as the opposite of a one-time mistake. The court found no evidence that defendant could be rehabilitated. The court found defendant's conduct on the day of the murders and before like none the court had ever seen and found that defendant had a proven track record of irretrievable depravity, permanent incorrigibility, and irreparable corruption beyond the possibility of rehabilitation. The court sentenced defendant to an aggregate 60-year term in the Illinois Department of Corrections, 30 years for each murder. Due to defendant's youth, the court declined to impose the discretionary firearm enhancements.

¶ 63    On October 20, 2020, defendant filed a motion to reconsider sentence, asserting that the sentence imposed was excessive and that the court placed improper weight on the statutory factors in aggravation and mitigation. The court denied defendant's motion and stated that defendant would have received more than a 60-year sentence if not for defendant's youth and attendant characteristics. Defendant appeals.

¶ 64    II. ANALYSIS

¶ 65    A. Meaningful Opportunity to Present a Complete Defense

¶ 66    On appeal, defendant maintains that his defense at trial was that the shooter was another person. To this end, defendant argues that the circuit court violated his right to present a complete defense when it prohibited defendant from playing the videotaped statement Morris gave to Detective Vasquez. Defendant argues the videotaped statement documented Morris's physical description of a shooter that was contrary to her trial testimony and, thus, the videotaped statement should have been introduced as both substantive evidence and for impeachment purposes. The State asserts that the purposes for which the defense wished to present the video— for substantive evidence and for impeachment—were satisfied by Morris's trial testimony. In

other words, the court did not err since the videotaped statement was cumulative. The State further posits that any error regarding the exclusion of the video was harmless.

¶ 67    "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, *** or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). When a party claims he was denied his constitutional right to present a complete defense due to an improper evidentiary ruling, the standard of review is abuse of discretion. *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 133; see *People v. Ware*, 2019 IL App (1st) 160989, ¶ 34 ("Whether to admit a prior inconsistent statement as substantive evidence is left to the trial court's discretion."). A court abuses its discretion only where its decision is arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the court. *People v. Lovejoy*, 235 Ill. 2d 97, 125 (2009).

¶ 68    Pursuant to Illinois Rule of Evidence 613(b) (eff. Sept. 17, 2019), before a witness may be impeached with extrinsic evidence of a prior inconsistent statement, a proper foundation must be laid upon which a witness is afforded the opportunity to explain or deny the statement and the opposing party is afforded an opportunity to interrogate the witness about the statement. *People v. Evans*, 2016 IL App (3d) 140120, ¶ 30. In addition to Rule 613(b), which provides for the admission of prior inconsistent statements solely for impeachment purposes, section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2018)) provides that prior inconsistent statements may be introduced as substantive evidence if they meet the requirements for admissibility. *People v. Patterson*, 2017 IL App (3d) 150062, ¶ 27; see also Ill. R. Evid. 801(d) (eff. Oct. 15, 2015). A party is not precluded from introducing prior inconsistent

28

statements simply because the witness admits to making those statements. *People v. Davis*, 254 Ill. App. 3d 651, 666 (1993); *People v. Shipp*, 2015 IL App (2d) 131309, ¶ 12. However, the court retains the ability to limit the scope of impeachment and is not required to allow "successive impeachment." *Davis*, 254 Ill. App. 3d at 666; *Ware*, 2019 IL App (1st) 160989, ¶¶ 34-36; see *People v. Pelegri*, 39 Ill. 2d 568, 576 (1968) ("[W]here a witness admits having made the contradictory statement, the statement itself is not required to be introduced into evidence.").

¶ 69 A review of the record in the instant matter reveals no abuse of discretion by the circuit court. Morris's videotaped interview with Detective Vasquez reveals her statements that after the gunshots were fired, she ran toward the front door but the shooter was there and a bullet grazed her hand, so she ran to the back door. Morris saw a muzzle flash and heard six or seven gunshots. Morris believed there was only one shooter and stated that she would not be able to identify the shooter again if she saw him. Detective Vasquez asked Morris what clothing the shooter was wearing, and Morris responded that he was wearing a green jacket, was a black male, and his hair was styled in dreadlocks. Morris indicated that the person's dreadlocks were around shoulder length and the jacket may have been camouflage. After standing up, Detective Vasquez asked Morris how tall the shooter was and if the shooter was around Vasquez's height, approximately six feet, two inches. Morris responded affirmatively. Morris added that the person had a dark-skinned complexion. To conclude the interview, Detective Vasquez informed Morris that he would likely conduct a follow-up interview, as witnesses often think clearer after getting rest following a traumatic experience.

¶ 70 In contrast to her statements during the recorded interview, Morris testified at trial that she did not see the shooter. Morris admitted that during her prior interviews at the hospital and

29

with Detective Vasquez, she stated that the shooter had dreadlocks. During cross-examination, Morris again admitted stating that the "person" had dreadlocks. Morris admitted that she agreed with Detective Vasquez that "he," presumably meaning the shooter, was approximately Detective Vasquez's height. However, Morris denied or did not recall stating that she saw the shooter during the interview. On redirect examination, Morris testified that she was trying to help the officers and assumed the shooter may have had dreadlocks because she saw an individual with dreadlocks near the muzzle flash. In other words, Morris had no explanation for why she made these statements other than that she was trying to help.

¶ 71　　　　We note that both Vasquez's questions during the interview and defense counsel's questions on cross-examination ambiguously intertwined the terms "shooter" and "person," such that Morris, under the circumstances, may have been confused by the questions. Regardless, a fair interpretation of Morris's videotaped statement reveals inconsistencies relative to her trial testimony. The State concedes as much and does not argue that the statement was inadmissible under either Rule 613(b) or section 115-10.1, which, among other things, require a prior inconsistent statement. The State's concession and defendant's argument are well taken. Morris's videotaped statement appears to meet the criteria for admission set forth in section 115-10.1. As discussed above, however, a statement's eligibility for admission does not end our inquiry as the circuit court retains the discretion to exclude even those statements that are admissible by rule.

¶ 72　　　　Here, the circuit court appeared to exclude Morris's videotaped statement because it was cumulative. See *Ware*, 2019 IL App (1st) 160989, ¶¶ 35-36. However, the court permitted defense counsel to cross-examine Detective Vasquez regarding Morris's prior statements and to reference the transcripts of Morris's trial testimony during closing argument. Defense counsel took full advantage of these opportunities by presenting Detective Vasquez's testimony that

30

Morris described the shooter to him during the videotaped interview. The defense also presented Detective Smith's testimony that hours after the shooting, Morris told him that the shooter had chin to shoulder length dreadlocks.

¶ 73    In similar fashion, the defense presented Wilson's prior inconsistent statements regarding whether he saw the shooter. The defense presented Detective Vasquez's testimony that Wilson also told him he had seen a person with dreadlocks at the party and assumed that person was the shooter. The defense also presented the stipulated testimony of Officer Gamma, who would testify that on April 9, 2018, Wilson told him that "when the shots went off he could tell that the male was tall and had dreads." During closing argument, defense counsel focused extensively on the inconsistent statements of Morris and Wilson, and the jury members were instructed as to the manner in which they could consider these prior inconsistent statements.

¶ 74    We do not disagree with defendant that Morris's prior inconsistent statements were central to defense's case. We do, however, disagree that the court's exclusion of the videotaped statement meaningfully interfered with defendant's right to present a complete defense. It is inarguable that the defense was allowed a full and fair opportunity to challenge the veracity of Morris's testimony and that the jury was well aware of her varying statements. Again, the court was not required to allow the admission of these cumulative prior statements. For these reasons, the exclusion of the videotaped statement was not an abuse of discretion.

¶ 75    Even assuming, *arguendo*, the court abused its discretion, the instant claim is subject to harmless error analysis. *People v. White*, 2017 IL App (1st) 142358, ¶¶ 30-31 (a violation of defendant's right to present a complete defense may be harmless if it appears that the error did not contribute to the verdict); *People v. Ramirez*, 2012 IL App (1st) 093504, ¶¶ 43-44; see *People v. Thompson*, 238 Ill. 2d 598, 609 (2010). To establish that a circuit court's error was

31

harmless, the State must prove beyond a reasonable doubt that the result would have been the same absent the error. *People v. Nitz*, 219 Ill. 2d 400, 410 (2006); *People v. Wilkerson*, 87 Ill. 2d 151, 157 (1981). To aid in this determination, we look to whether (1) the error contributed to the conviction, (2) the evidence overwhelmingly supports the conviction, or (3) the evidence is cumulative or merely duplicates properly admitted evidence. *Wilkerson*, 87 Ill. 2d at 157. After reviewing these considerations, we conclude that any hypothetical error concerning the defense's wishes to publish Morris's videotaped interview was harmless in light of the other evidence offered in the case.

¶ 76        First, the alleged error could not have contributed to the guilty verdicts where, as stated above, the jury was more than aware of Morris's prior descriptions of the shooter.

¶ 77        Second, the evidence of defendant's guilt was overwhelming. During an audio-recorded conversation that was played before the jury, defendant admitted to, bragged about, and provided details concerning the shooting that he could not have known unless he was the shooter. A witness testified that defendant was at the party with the murder weapon in his waistband, and defendant posted a photograph to his Facebook account within an hour of the shooting that appeared depict defendant with the murder weapon. Multiple witness also confirmed that defendant confessed he was the shooter during conversations following the shooting, *inter alia*.

¶ 78        Lastly, as discussed above, Morris's prior statement to the police was entirely cumulative of Wilson's pretrial description of the shooter having dreadlocks. Witnesses also testified that Watkins had previously possessed the murder weapon and that Watkins had dreadlocks on the date in question. Simply stated, the jury was made aware of the defense's theory that Watkins was the shooter and wholly rejected this theory. Because the excluded evidence was cumulative, and the evidence of defendant's guilt was overwhelming, we cannot say the absence of Morris's

32

videotaped statement contributed to defendant's convictions. Thus, any error, if committed, was harmless beyond a reasonable doubt.

¶ 79                                    B. Defendant's Sentence

¶ 80        Next, defendant raises the following claims of error regarding sentencing: (1) the court improperly relied on certain contents of the PSI, (2) the court failed to properly apply the requisite factors in mitigation, and (3) defendant's sentence violated the proportionate penalties clause or was otherwise excessive. We address defendant's arguments *seriatim*.

¶ 81                          1. Circuit Court's Consideration of the PSI

¶ 82        Defendant initially argues the court committed an abuse of discretion by placing significant weight on hearsay evidence in the form of the incident reports attached to defendant's PSI, where no witness testified concerning the contents of the reports. See *People v. Minter*, 2015 IL App (1st) 120958, ¶ 147; *People v. McAfee*, 332 Ill. App. 3d 1091, 1096 (2002). Defendant concedes forfeiture of the instant argument for having failed to raise an objection either contemporaneously or in a postsentencing motion. See *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Thus, to obtain relief in the sentencing context, defendant must show that a clear and obvious error occurred and that either "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.* at 545.

¶ 83        During the aggravation/mitigation stage of sentencing, the ordinary rules of evidence are relaxed such that the only requirements for admissibility are that the evidence be relevant and reliable. *People v. Terrell*, 185 Ill. 2d 467, 505 (1998); see *People v. Armstrong*, 183 Ill. 2d 130, 152 (1998); *People v. Harris*, 375 Ill. App. 3d 398, 408 (2007). Indeed, section 5-4.5-105(a)(9) provides that when sentencing a person who is under 18 years of age at the time of the offense,

33

the court shall consider any information it finds relevant and reliable. 730 ILCS 5/5-4.5-105(a)(9) (West 2020). To this end, "a sentencing court is given broad discretionary power to consider various sources and types of information so that it can make a sentencing determination within the parameters outlined by the legislature." *Harris*, 375 Ill. App. 3d at 408; see *People v. La Pointe*, 88 Ill. 2d 482, 494-95 (1981) (instructing that a sentencing court is not limited to considering only information that would be admissible under the adversarial circumstances of trial, however, the court must exercise care to ensure the accuracy of the information considered).

¶ 84        At the outset, there is no question that the contested incident reports were relevant to the court's sentencing determination. Accordingly, we focus our analysis on the reliability of evidence as it pertains to the court's proper consideration of such. Defendant cites to supreme court decisions such as *Armstrong*, 183 Ill. 2d 130, *People v. Jackson,*182 Ill. 2d 30 (1998), and *Terrell*, 185 Ill. 2d at 467, in support of his argument that witness testimony was necessary to establish the reliability of the incident reports generated by the juvenile detention center, the Peoria County jail, and Peoria School District 150 that were attached to defendant's PSI. In supreme court holdings such as *Armstrong*, *Jackson*, *People v. Ward*, and *People v. Banks*, records officers and/or personnel from correctional facilities testified concerning the defendants' behavior while incarcerated. *Armstrong*, 183 Ill. 2d at 155; *Jackson*, 182 Ill. 2d at 45-46; *People v. Ward*, 154 Ill. 2d 272, 328 (1992); *People v. Banks*, 237 Ill. 2d 154, 170 (2010). In such cases, the court found no error concerning the court's consideration of disciplinary and/or incident reports documenting the defendants' behavior where, among other things, the witness testimony aided in establishing the reliability of those reports. See *Armstrong*, 183 Ill. 2d at 156-57; *Jackson*, 182 Ill. 2d at 85; *Banks*, 237 Ill. 2d at 204; *Ward*, 154 Ill. 2d at 330-31. Even so, the

34

mere fact that witnesses testified in these cases did not serve to establish a bright-line rule that incident reports could only be considered reliable if accompanied by witness testimony. Indeed, procuring witnesses to establish the reliability of similar records at sentencing would place an unnecessary hardship on the prosecution, especially in the absence of any persuasive argument by a defendant as to why the records are unreliable. *Ward*, 154 Ill. 2d at 330-31; see also *Jackson*, 182 Ill. 2d at 84 (discussing defendant's failure to point to any aspect of the contested evidence that was unreliable). Moreover, these supreme court cases are distinguishable from the instant case for several reasons.

¶ 85    Cases such as *Armstrong*, *Jackson*, *Banks*, and *Ward* concerned capital sentencing, and the evidence in those cases was presented by the State in aggravation. Here, the contested evidence was incorporated into the PSI itself, a report which the sentencing court is mandated to consider. 730 ILCS 5/5-3-1 (West 2020). In other words, the fact that the PSI in this case was compiled and offered after an independent investigation by a neutral third party—the probation department—is *prima facie* evidence of the reliability of the information contained therein. Obviously, the court in this case inherently found the PSI to be reliable by considering its contents. The court also stated that it had considered all the relevant sentencing factors, which necessarily includes information the court found to be relevant and reliable. *Id.* § 5-4.5-105(a)(9). In the absence of any persuasive argument by defendant as to why the records were unreliable, we find no abuse of discretion in the court's consideration of the PSI.

¶ 86    What is more, defendant has arguably waived this argument to the extent that plain error review is no longer available. See *People v. Sophanavong*, 2020 IL 124337, ¶ 20 (instructing that forfeiture is the failure to make the timely assertion of a right, while waiver is an intentional relinquishment or abandonment of a known right or privilege). In compliance with section 5-3-

4(b)(2), which mandates that the State and defendant's attorney receive the PSI at least 3 days prior to the imposition of the sentence, the PSI in this case was filed 14 days prior to the sentencing hearing. 730 ILCS 5/5-3-4(b)(2) (West 2020). One of the purposes of this advance notice is to allow the parties to bring any errors in the report to the court's attention. *People v. Williams*, 149 Ill. 2d 467, 495 (1992); *People v. Matthews*, 362 Ill. App. 3d 953, 967 (2005) (the legislature provided a safeguard to ensure the accuracy of the information contained in the PSI by making it available to the parties three days prior to sentencing).

¶ 87 At the commencement of the instant sentencing hearing, the parties conceded the accuracy of the contents of the PSI by confirming that they had received the report and that no additions or corrections were necessary. Simply, defendant's failure to object at this time results in a concession of the PSI's accuracy and the waiver of any claims of inaccuracy, and the sentencing court is entitled to consider its contents. *Williams*, 149 Ill. 2d at 493; *Matthews*, 362 Ill. App. 3d at 967 ("the failure to object [to a PSI] results in a concession of its accuracy and the waiver of the claims of inaccuracy"); *People v. Hibbler*, 2019 IL App (4th) 160897, ¶¶ 55-60 (refusing to review defendant's plain error contention regarding the contents of the PSI because defendant's failure to object operated as a stipulation as to the reliability of the document. Also likening a parties' failure to object to the PSI to a stipulation that the court may consider the information contained in the PSI).

¶ 88 We also reject defendant's contention that defense counsel was ineffective for failing to object to the contents of the PSI. To demonstrate ineffective assistance of counsel at sentencing, a defendant must demonstrate on appeal that (1) counsel's performance fell below an objective standard of reasonableness and (2) that there is a reasonable probability that counsel's poor performance affected the sentence defendant received. *People v. Steidl*, 177 Ill. 2d 239, 257

36

(1997). In our view, the sole reason to object to the court's consideration of the PSI would be if counsel's review of the document uncovered inaccuracies. Up to this point, defendant has lodged no allegation that any part of the PSI was inaccurate. As such, defense counsel had no good-faith grounds on which to object to the PSI's admission and could not have performed deficiently on this basis.

¶ 89         2. Application of the Requisite Factors in Mitigation

¶ 90   Next, defendant submits that the court failed to appropriately apply the statutory mitigating factors present in section 5-4.5-105(a) (730 ILCS 5/5-4.5-105(a) (West 2020)). Defendant argues the court improperly considered statutory mitigating factors in aggravation rather than mitigation. We disagree where this record demonstrates the court's thorough consideration of the statutory factors designated for its attention.

¶ 91   Section 5-4.5-105(a) provides that when sentencing a person who is under 18 years of age during the commission of the offense, the court shall consider the following additional factors in mitigation in determining the appropriate sentence:

> "(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;
>
> (2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;
>
> (3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." *Id.*

A court abuses its discretion when it considers an improper factor in aggravation. *Minter*, 2015 IL App (1st) 120958, ¶ 147; *McAfee*, 332 Ill. App. 3d at 1096.

¶ 92    Without wholly reciting the court's findings, the record establishes that the court considered defendant's age, youth, impetuosity, level of maturity, family history, cognitive or developmental disability, potential for rehabilitation, education, parental neglect, childhood trauma, role and level of planning, participation in his defense, and juvenile/criminal history. The court considered the circumstances of the offense and any peer pressure defendant was under at the time. The court also explained that it had considered all the relevant factors, even if it failed to mention a factor specifically.

¶ 93    As the State argues, nothing in section 5-4.5-105(a) requires the court to assign weight to a factor in mitigation when a reasonable consideration of that factor does not justify such an

assignment. Defendant's own argument demonstrates this very point. For instance, defendant concedes, "given his prior adjudications of delinquency," the mitigating factor regarding prior juvenile and criminal history is not present. Further, the record does not demonstrate that the court considered several mitigating factors in aggravation as defendant argues. For example, defendant asserts the court improperly considered defendant's youth and attendant characteristics in aggravation. To demonstrate the court's improper consideration of defendant's youth and impetuous behavior, defendant highlights the court's comment that defendant's extensive history of criminality seemed to demonstrate that he was no longer acting impetuously. Defendant takes this comment to mean that the court considered his inherent impetuosity as an aggravating factor. Not so. A reasonable interpretation of the court's comment reveals that the court was simply assigning less weight to defendant's inherent impetuosity under the circumstances. Furthermore, the record reflects that the court specifically acknowledged the fact that the brains of juveniles are not fully developed.

¶ 94          In totality, the record reflects that the court thoroughly and reasonably applied the requisite sentencing factors. In essence, defendant asks this court to reweigh the statutory sentencing factors in his favor. It is well-established, however, that the sentencing court had a far better opportunity to consider factors such as defendant's general moral character, mentality, social environment, habits, and age than this court, which must rely on the cold record. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). Consequently, this court must not substitute its judgment for that of the sentencing court merely because the requisite factors could have been weighed differently. *Id.* For these reasons, the court complied with section 5-4.5-105(a) at sentencing.

¶ 95                         3. Proportionate Penalty/Excessive Sentence

¶ 96        Defendant argues that even if the court complied with section 5-4.5-105(a) during

sentencing, his sentence nevertheless runs afoul with the Illinois proportionate penalties clause.

Defendant contends his sentence shocks the moral sense of the community because it failed to

account for his rehabilitative potential. Defendant acknowledges his forfeiture of this claim and

requests plain error review. Defendant further alleges counsel was ineffective for failing to raise

the claim.

¶ 97        The proportionate penalties clause of the Illinois Constitution provides that "[a]ll

penalties shall be determined both according to the seriousness of the offense and with the

objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Thus, the

proportionate penalties clause prohibits punishment that is cruel, degrading, or so wholly

disproportionate to the offense as to shock the moral sense of community. *People v. Miller*, 202

Ill. 2d 328, 338 (2002). "When the offender is a juvenile and the offense is serious, there is a

genuine risk of disproportionate punishment." *People v. Holman*, 2017 IL 120655, ¶ 33. For this

reason, a sentencing scheme that mandates life in prison without possibility of parole for juvenile

offenders is prohibited. *Miller v. Alabama*, 567 U.S. 460, 479 (2012) ("By making youth (and all

that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme

poses too great a risk of disproportionate punishment."). However, a juvenile defendant may be

sentenced to life imprisonment without parole, or an equivalent *de facto* life sentence, if the court

is empowered to consider the defendant's youth and attendant characteristics, as well as other

mitigating circumstances, in fashioning a sentence. *Id.* at 483; see *People v. Buffer*, 2019 IL 122327, ¶¶ 37-42 (instructing that a *de facto* life sentence for a juvenile begins at 40 years).[11]

¶ 98  As discussed above, the sentencing court complied with the requirements of *Miller* and its progeny, which includes the enactment of section 5-4.5-105(a), in fashioning defendant's sentence. Again, regarding proportionality, defendant primarily argues that his sentence did not account for his rehabilitative potential. In so arguing, defendant asks this court to reweigh the requisite statutory factors to emphasize the mitigating factors while minimizing the aggravating factors. We are not inclined or entitled to do so. A defendant's rehabilitative potential is not entitled to greater weight than the seriousness of the offense, which the sentencing court aptly described as unlike anything it had ever seen. See *Alexander*, 239 Ill. 2d at 214. Defendant was eligible to receive 170 years' imprisonment or more (60 years on each count plus 25-year-to-life firearms enhancements on each count). Defendant received a total of 60 years, and the court, in its discretion, declined to impose the 25-year-to-life firearm enhancements. During the hearing on defendant's motion to reconsider sentence, the court noted that defendant would have received a greater sentence were it not for his youth and attendant characteristics.

¶ 99  Based on this record, we reject defendant's proportionate penalties argument where defendant's sentence was not so wholly disproportionate to the offense as to shock the moral sense of community. Accordingly, defendant can establish neither plain error nor ineffective assistance on this basis. For the same reasons, we reject defendant's nearly identical closing argument that his sentence was otherwise excessive where it fails to reflect defendant's

---

[11]We note that the circuit court in this case made a finding concerning defendant's incorrigibility pursuant to *Holman*, 2017 IL 120655, ¶ 46. However, based on the recent holding in *Jones v. Mississippi*, ___ U.S. ___, ___141 S. Ct. 1307, 1311 (2021), our supreme court in *People v. Dorsey*, 2021 IL 123010, ¶ 40, appears to question whether such factual findings are necessary before sentencing a juvenile offender to a life sentence. No matter, defendant suffers no prejudice as a result of this finding.

41

rehabilitative potential or the substantial mitigating factors present. Defendant's convictions are affirmed.

¶ 100                                    III. CONCLUSION

¶ 101          The judgment of the circuit court of Peoria County is affirmed.

¶ 102          Affirmed.

¶ 103          JUSTICE PETERSON, specially concurring:

¶ 104          The majority finds that the trial court did not abuse its discretion by denying defendant's request to use Morris's videotaped interview for purposes of impeachment or as substantive evidence. The majority also finds that the trial court did not err when it imposed defendant's sentence. I agree with the result but write separately with respect to the trial court's evidentiary decision.

¶ 105          In this case, Morris gave a detailed description of the shooter in response to Detective Vasquez's questions about the shooting and the culprit's characteristics. She told Vasquez she saw the shooter, he was about six feet, two inches, tall, and he had dreadlocks. At trial, however, she denied telling Vasquez that she saw the shooter. Yet, she went on to testify that she did recall telling Vasquez that the shooter had dreadlocks. She also testified that she could not recall telling Vasquez that the shooter was six feet two inches tall. According to Morris, she just assumed the person with dreadlocks was the shooter because she saw him near the muzzle flash. Not only did Morris's testimony at trial contain internal contradictions, her testimony also contradicted the statements she made to Vasquez during the interview.

¶ 106          Section 115-10.1 provides that prior inconsistent statements may be offered as substantive evidence if the statement is inconsistent with their testimony at the hearing or trial, the witness is subject to cross-examination concerning the statement, and the statement is proved

42

to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording. 725 ILCS 5/115-10.1(a), (b), (c)(2)(C) (West 2018). All of the criteria are met in this case. The videotaped interview also qualified as impeachment evidence. Illinois Rule of Evidence 613(b) (eff. Sept. 17, 2019) provides that a witness may be impeached with extrinsic evidence of a prior inconsistent statement as long as a proper foundation is laid, affording the witness to explain or deny it, and the opposing party is afforded an opportunity to interrogate the witness about the statement. As such, the videotaped interview should have been admitted as substantive and impeachment evidence.

¶ 107    Despite this, the majority finds that the trial court did not abuse its discretion when it denied defendant's request to publish this admissible evidence to the jury. At trial, the State argued that playing the video was unnecessary because Morris admitted to making the prior inconsistent statements during cross-examination. The trial court agreed with the State, but the transcripts do not support the State's argument. Morris's trial testimony reveals that she denied telling Vasquez that she saw the shooter and she did not recall if she told Vasquez the shooter's height. I acknowledge that Vasquez testified that Morris told him she saw the shooter and provided a description. However, the varying accounts of what happened during the interview may have left the jury wondering what Morris actually said. Presenting the videotaped interview would have impeached her trial testimony that she did not see and identify the shooter. Although the trial court allowed the defense to read relevant portions of the transcripts of the interview to the jury during closing argument, statements at closing arguments are not evidence, and the jury was instructed not to consider the arguments as evidence. The clear benefit of being able to use such statements as substantive evidence is that it places such testimony on an equal footing with the other evidence admitted at trial, making it more persuasive in the eyes of the jury. *People v.*

43

*Wilson*, 149 Ill. App. 3d 1075, 1078-79 (1986). Therefore, I would find the trial court abused its discretion when it denied defendant's request to submit Morris's videotaped interview to the jury.

¶ 108  Although I would find the trial court abused its discretion on this evidentiary issue, I agree with the majority that the error is harmless (*supra* ¶¶ 75-78). In a recording, defendant admitted to and bragged about the shooting and he also provided details about the shooting that only the shooter would know. Multiple witnesses also confirmed that defendant confessed to being the shooter. Additionally, defendant posted a photograph on social media shortly after the shooting that arguably showed defendant with the murder weapon. Thus, the evidence of defendant's guilt is overwhelming, and I concur with affirming defendant's conviction and sentence.

*People v. Brock*, 2022 IL App (3d) 200430

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 18-CF-227; the Hon. Paul P. Gilfillan, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Christofer R. Bendik, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Jodi Hoos, State's Attorney, of Peoria (Patrick Delfino, Thomas D. Arado, and Justin A. Nicolosi, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |